THOMAS C. RINK AND ALISON W. RINK, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 20318–91.  Filed April 7, 1993.

*Thomas C. Rink,* pro se.
*James D. Hill,* for respondent.

RUWE, *Judge:* Respondent determined deficiencies of $8,118 and $4,983 in petitioners' Federal income taxes for 1985 and 1986, respectively. The issue we must decide is whether petitioners are precluded from claiming depreciation deductions for the taxable year 1986 as a result of a closing agreement executed by the parties in 1987.[1]

---

[1] The deficiency determined for 1985 results from respondent's disallowance of an investment credit carryback from 1986. There is no dispute between the parties regarding the amount of this credit. Our resolution of the closing agreement dispute will determine whether the

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners resided in Cincinnati, Ohio, when they filed their petition.

Petitioner Thomas C. Rink is an experienced tax attorney. In 1980, Mr. Rink began advising Moore, Owen, Thomas & Co. (Moore), an equipment-leasing company, on legal and tax matters.

On December 30, 1980, Mr. Rink purchased three lawn service trucks from Moore. Mr. Rink's trucks were subject to a prior lease, running from November 14, 1980, through December 31, 1988, between Moore, as lessor, and Chemlawn Corp. (Chemlawn), as lessee. Mr. Rink assumed a zero salvage value for the trucks and claimed depreciation deductions that exhausted the full basis over the course of the taxable years 1980, 1981, 1982, and 1983. Several other investors, including Charles G. Atkins, also purchased lawn service trucks from Moore and calculated depreciation based upon a zero salvage value estimate.

Respondent issued statutory notices to petitioners and the other investors based upon a determination that the lawn service trucks had substantial salvage value. During 1986, several of the investors, including Mr. Rink and Mr. Atkins, filed petitions with this Court challenging respondent's determinations. Mr. Rink represented Mr. Atkins and some of the other taxpayers in those proceedings. In December 1986, Mr. Rink and Ms. Sherri L. Feuer, senior attorney for respondent, began to negotiate a settlement which was to include a closing agreement regarding allowable depreciation deductions on the trucks owned by Mr. Atkins. The negotiations continued until October 1987.

In attempting to settle Mr. Atkins' case, Ms. Feuer initially drafted a proposed Form 906 (Closing Agreement On Final Determinations Covering Specific Matters), which, in paragraph 2, specified allowable depreciation deductions for Mr. Atkins. That draft agreement also contained the following paragraphs:

carryback is available for use in 1985. Respondent has conceded an additional deduction for 1986 in the amount of $230.

3. That except as set forth in paragraph (2), the taxpayers are entitled to no additional losses or deductions for depreciation with regard to the above transaction.

4. This agreement does not prohibit additional losses or depreciation for taxable years beginning after December 31, 1988, to the extent permitted by the Internal Revenue Code and the regulations thereunder.

Ms. Feuer presented the draft to Mr. Rink during December 1986, or January 1987, but the parties were unable to reach agreement, and the draft was not executed.

On December 31, 1986, Mr. Rink and Moore's director of U.S. operations signed a document entitled "Master Vehicle Lease", by which Mr. Rink purported to re-lease the three trucks to Moore for a base term of 48 months beginning January 1, 1989. Mr. Atkins signed a similar agreement with Moore during 1986. Mr. Rink did not inform Ms. Feuer of the execution of these lease documents.

On January 26, 1987, Mr. Rink sent Ms. Feuer a letter, in which he stated:

I am returning herewith an executed copy of the letter which you prepared for Judge Gerber. Thanks for your help.

Also, with respect to the Atkins settlement, my client has advised that he wishes to accept your offer of the 30% settlement, with the understanding that this will result in an adjustment of his salvage value account which affects his 1982 and 1983 tax years. It is our further understanding, however, that *if and when* his equipment is released, he will again be able to readjust his salvage value account.

I know that your concern has been that the amount of this adjustment might be disproportionate to the length of the extension period. We have discussed some "reasonableness" standard, but it might be possible to quantify the matter to each side's satisfaction. For example, if the equipment is released for no more than two years, then the 30% salvage value would remain the same, but if the lease extension were for three years, then the salvage value would be adjusted to 20%, and if it was for four years or more, then the salvage value would be adjusted to zero percent. In the latter situation, this would permit him to take advantage of his elective 10% reduction.

I would like to see this type of objective standard met in the closing agreement, just as you would, so that we do not have to face this issue again in the future.

[Emphasis added.]

Ms. Feuer responded in a letter dated February 5, 1987. In numbered paragraph 1 of the letter she stated:

If Mr. and Mrs. Atkins renegotiate a lease with Chemlawn, or any other third party, the salvage value can be redetermined at that time. However,

the Service cannot agree to a future salvage value now, as you suggested, since the value will depend on the facts and circumstances of the particular transaction.

On June 10, 1987, Mr. Rink sent to Ms. Feuer a letter in which he proposed the following:

Also, paragraphs 3 and 4 of the Closing Agreement should be clarified by deleting them and inserting a new paragraph 3 as follows:

"3. The taxpayers are entitled to no additional losses or deductions for depreciation with regard to the above transaction except as set forth in paragraph 2 above, with the exception that if the taxpayers renegotiate a lease with Chemlawn Corporation or any other third party, the salvage value can be redetermined at that time."

If you refer to your letter of February 5, 1987 in paragraph 1 thereof, I believe that you will find that the above substitute paragraph 3 accurately reflects the proposal to which we agreed.

During the course of the above correspondence, Ms. Feuer always believed that Mr. Rink—in his references to the potential renegotiation of lease agreements—was speaking about leases to be negotiated in the future. In her own correspondence, Ms. Feuer—when referring to the potential for renegotiation of lease agreements—intended to refer only to leases negotiated in the future. Mr. Rink was aware that this was Ms. Feuer's intent. Nevertheless, Mr. Rink never informed Ms. Feuer of the December 31, 1986, master vehicle lease agreements between Mr. Rink and Moore, or the similar agreement between Mr. Atkins and Moore.

Petitioners filed a joint Federal income tax return for the taxable year 1986 on July 15, 1987, pursuant to an extension. On Form 4562 (Depreciation and Amortization) petitioners claimed a deduction for "Chemlawn CLADR Salvage Value Adjustment" in the amount of $24,990. This represented depreciation on Mr. Rink's three trucks. These three trucks had been fully depreciated on petitioners' returns for prior years, and those prior depreciation deductions were the subject of settlement negotiations between Mr. Rink and respondent at the time the 1986 return was filed. At the time they filed their 1986 return, petitioners had not yet executed an agreement with respondent as to the salvage value of Mr. Rink's trucks or as to allowable depreciation deductions for prior taxable years. Mr. Rink never informed Ms. Feuer that

petitioners had claimed a 1986 depreciation deduction for the three trucks based on a salvage value adjustment.

On October 3, 1987, Mr. Atkins and his wife signed a Form 906 closing agreement covering allowable depreciation deductions on their trucks. This agreement contained a paragraph 3 identical in all material respects to the paragraph 3 suggested by Mr. Rink in his letter of June 10, 1987. This agreement ultimately served as the model for closing agreements regarding allowable depreciation deductions on the trucks of many of the investors, including petitioners. On October 16, 1987, petitioners signed a Form 906 closing agreement covering the depreciation on Mr. Rink's trucks with language in paragraph 3 that was identical to that in the Atkins' agreement.[2]

The lease agreements executed by Mr. Rink and Moore on December 31, 1986, contained a clause that allowed Moore, in its sole discretion, to terminate the lease. On December 31, 1986, Moore had no corresponding agreement to sublease the trucks to Chemlawn. The trucks were never actually leased to Moore pursuant to the terms of the 1986 lease agreements. Instead, on December 28, 1988, Mr. Rink and Moore executed a lease, the terms of which were to take effect as of October 1, 1988. The December 28, 1988, lease refers to the original 1980 lease from Moore to Chemlawn as the lease under which Mr. Rink was currently leasing the

---

[2] Petitioners' Form 906 closing agreement contained the following terms:

WHEREAS:

In connection with and as an incident to the settlement of a case involving the parties to this agreement, presently pending before the United States Tax Court at Docket No. 20432–86, which case will be closed on the basis of a settlement reflected in a decision which the parties agree the Tax Court may enter when submitted to the Court for filing, the parties desire to agree as to:

1. The allowable losses resulting solely from depreciation, resulting from the purchase of three trucks in December of 1980 from Moore, Owen and Thomas and the leasing of those trucks to the Chemlawn Corporation, for the period of November 14, 1980 through December 31, 1988.

NOW IT IS HEREBY DETERMINED AND AGREED FOR FEDERAL INCOME TAX PURPOSES:

1. That on December 30, 1980, the taxpayers purchased three trucks from Moore, Owen and Thomas, for a purchase price of $84,016.00. The trucks were subject to an eight-year lease agreement dated November 14, 1980 between Moore, Owen and Thomas as lessor and the Chemlawn Corporation as lessee.

2. That in connection with the above transaction, the taxpayers are entitled to a deduction for depreciation in the amount of $21,004.00 for the taxable year 1980 and a deduction for depreciation in the amount of $31,504.00 for the taxable year 1981.

3. That the taxpayers are entitled to no additional losses or deductions for depreciation with regard to the above transaction, except as set forth in paragraph 2 above, with the exception that *if the taxpayers renegotiate a lease with the Chemlawn Corporation or any other third party, then salvage value may be redetermined at that time.* [Emphasis added.]

trucks and specifies that the "current" 1980 lease is terminated as of September 30, 1988. The December 28, 1988, lease makes no reference to the existence or cancellation of the 1986 lease agreement. In October 1988, Moore had executed a lease agreement with Chemlawn to sublease Mr. Rink's trucks.

Respondent disallowed petitioners' 1986 deduction for "salvage value adjustment", and petitioners filed a timely petition with this Court.

## OPINION

Section 7121(a)[3] authorizes respondent to enter into closing agreements in writing with any person relating to the liability of that person in respect of any internal revenue tax and any taxable period. Closing agreements are binding on the parties as to the matters agreed upon and may not be annulled, modified, set aside, or disregarded in any suit or proceeding unless there is a showing of fraud, malfeasance, or misrepresentation of a material fact. Sec. 7121(b); *Estate of Magarian v. Commissioner,* 97 T.C. 1, 4-5 (1991); *Zaentz v. Commissioner,* 90 T.C. 753, 760 (1988).

Neither respondent nor petitioners ask us to set aside the closing agreement; both assert that the closing agreement is clear and unambiguous. However, each side seeks to enforce a different interpretation of the agreement.

The stated purpose of the closing agreement was to determine petitioners' allowable truck depreciation deductions. The closing agreement allowed petitioners depreciation deductions for the trucks for the years 1980 and 1981, but allowed no deductions for subsequent years. However, paragraph 3, the provision in question, states: "if the taxpayers renegotiate a lease with the Chemlawn Corporation or any other third party, then salvage value may be redetermined at that time." The closing agreement was executed on October 16, 1987. Petitioners assert that the provision "makes no reference to the time at which a new lease may be renegotiated," and that their arrangement with Moore, executed on December 31, 1986, falls within its terms. Respondent argues

---

[3] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

that paragraph 3 of the closing agreement is prospective and contemplates only a lease renegotiated after the execution of the closing agreement on October 16, 1987.

Ordinary principles of contract law govern the interpretation of closing agreements.[4] *Smith v. United States,* 850 F.2d 242, 245 (5th Cir. 1988); *United States v. Lane,* 303 F.2d 1, 4 (5th Cir. 1962); *Geringer v. Commissioner,* T.C. Memo. 1991-32; *Temple v. United States,* 11 Cl. Ct. 302, 305 (1986). Contract law principles generally direct that we look within the "four corners" of the agreement, unless it is ambiguous as to essential terms. See *Geringer v. Commissioner, supra;* Calamari & Perillo, Contracts 167 (3d ed. 1987) ("Although the Plain Meaning Rule has been condemned * * * it is undoubtedly still employed frequently or on occasion by the great majority of the jurisdictions in this country." (Fn. refs. omitted.)).

We believe, as do both parties, that the closing agreement is clear and unambiguous. Paragraph 3 states that *"if* the taxpayers renegotiate a lease * * * *then* salvage value may be redetermined *at that time."* (Emphasis added.) "[I]f", "then", and "at that time", all used in paragraph 3, are words of prospectivity. "If", when used on its own, may mean "in the event that", which is prospective, or "allowing, conceding, or granting that", which may be considered backward looking. Webster's Third New International Dictionary (1986). However, when used in conjunction with "then" and "at that time", "if" speaks of an event yet to come. *If* that event occurs, *then* salvage value may be redetermined *at that time.*

Petitioners' interpretation is as follows:

> Paragraph 3 of the Closing Agreement is prospective in nature, but not in the manner that the Respondent argues. It is prospective in that paragraphs 1 and 2 deal with taxable years 1980 and 1981 and paragraph 3 deals with any year subsequent thereto in which a lease is renegotiated. * * * [Petitioners' Reply Brief at 5-6].

We reject this interpretation as a distorted and incorrect reading of the closing agreement. Petitioners wish to give effect to a "renegotiated lease" and an adjustment that were

---

[4] This is not true with regard to the validity or enforceability of closing agreements, determinations subject solely to sec. 7121. See *Perry v. Page,* 67 F.2d 635, 636 (1st Cir. 1933); *Proctor v. White,* 28 F. Supp. 161, 167 (D. Mass. 1939); see also 14 Mertens, Law of Federal Income Taxation, sec. 52.11, at 22 (1990 rev.). We are not engaged in either of those determinations here.

events long past at the time the closing agreement was executed. Under petitioners' reading, the words of paragraph 3 describe the past as if it had not yet come. Petitioners offer no rules of language or interpretation that might sway us toward this reading. We find that paragraph 3 speaks prospectively as of the date of its execution. We also believe that our reading of paragraph 3 is consistent with what a reasonable person would have believed if such person had knowledge of the facts surrounding the dispute that was being settled and knowledge of the representations of the parties during the settlement negotiations. Petitioners acknowledge that Mr. Rink was aware of respondent's understanding of the agreement and that he did nothing to dispel that understanding. If petitioners wanted an agreement allowing them to accelerate depreciation deductions on the basis of Mr. Rink's December 31, 1986, lease agreement, that intent could have been easily and directly stated in the closing agreement. See *Geringer v. Commissioner, supra.*

Even if we believed that the language in question was ambiguous, the extrinsic evidence offered by the parties, when viewed in light of general contract principles, weighs strongly against petitioners' position. Petitioners bear the burden of proving that their interpretation of any "ambiguous" contract language is the correct one. Rule 142(a); see *Peterson Machine Tool, Inc. v. Commissioner,* 79 T.C. 72, 82 (1982), affd. 54 AFTR 2d 84-5407, 84-2 USTC par. 9885 (10th Cir. 1984).

When each party intends a different meaning for an ambiguous term, Corbin would maintain that no contract exists, unless one party knew or had reason to know what the other party intended. 3 Corbin On Contracts, sec. 538 (1960). If one party knew or had reason to know what the other party intended, then the party with actual or imputed knowledge will be bound to the meaning intended by the other party. *Id.;* 2 Restatement, Contracts 2d, sec. 201 (1981);[5] accord 1 Restatement, Contracts, sec. 233(b) (1936);

---

[5] 2 Restatement, Contracts 2d, sec. 201(2) (1981), states:

(2) Where the parties have attached different meanings to a promise or agreement or a term thereof, it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made

(a) that party did not know of any different meaning attached by the other, and the other knew the meaning attached by the first party; or

(b) that party had no reason to know of any different meaning attached by the other, and

3 Williston, Treatise on the Law of Contracts, sec. 607, at 1741 (1936 rev.). Mr. Rink stated at trial and on brief that he not only had reason to know, but did know the meaning attached to paragraph 3 by Ms. Feuer.

In their brief, petitioners state that "Mr. Rink, as counsel to the other truck owners, recognized Respondent's intention, but was forced to remain silent by the professional code of ethics, which commands undivided loyalty to his client." Petitioners' Opening Brief at 9-10. Petitioners do not attempt to explain which specific provisions of the code of ethics precluded Mr. Rink from disclosing the facts to respondent in order to clear up what Mr. Rink admittedly foresaw as a basic disagreement over the meaning of the terms of the final closing agreement that he was negotiating for himself and others. In any event, the existence of a duty to others would not change Mr. Rink's status and obligation as a party who had full knowledge of respondent's intent regarding the meaning of his own closing agreement. We can discern no privilege that Mr. Rink could claim with respect to his own intent, or to the existence of his own 1986 lease agreement and 1986 income tax return.[6] When asked during trial why he withheld information about the 1986 leases, Mr. Rink stated: "Because I wasn't asked."[7] As previously stated, when one party knows or has reason to know what the other party intended, the intended meaning of that other party is adopted. It follows that respondent's interpretation should be employed; thus, Mr. Rink's 1986 lease was not an event contemplated by paragraph 3 of the closing agreement.

According to Corbin, evidence of the parties' subjective intent may always be considered in analyzing their respec-

the other had reason to know the meaning attached by the first party.

[6] Mr. Rink contends that he "gave Respondent the opportunity to discover" that their intentions were dissimilar by proposing the language which was ultimately used in paragraph 3. Petitioners' Opening Brief at 10. We disagree. Mr. Rink's letter of June 10, 1987, proposes the language as a "clarification".

[7] Petitioners filed their 1986 return approximately 3 months prior to entering into the closing agreement. On that 1986 return, they claimed a depreciation deduction in the amount of $24,990, which was described on the return as "Chemlawn CLADR Salvage Value Adjustment". The trucks for which Mr. Rink claimed depreciation on petitioners' 1986 return had previously been fully depreciated on petitioners' returns for prior years. Part of the prior depreciation deductions had been disallowed by respondent and those prior years were the subject of the settlement negotiations between Mr. Rink and Ms. Feuer during 1987. Nevertheless, Mr. Rink did not tell Ms. Feuer about the $24,990 deduction that was claimed on the 1986 return, and the 1986 return made no reference to the fact that the trucks had been fully depreciated on prior returns which were currently the subject of ongoing settlement negotiations.

tive interpretations. 3 Corbin On Contracts, sec. 542, at 101-103 (1960); 2 Restatement, Contracts 2d, sec. 201. Evidence of surrounding facts and circumstances may be considered as well. 3 Corbin, *supra,* sec. 538, at 57-58; 2 Restatement, Contracts 2d, sec. 212(1); see Farnsworth, Contracts, sec. 7.10, at 511 (2d ed. 1990). In the case of ambiguous contract provisions, Williston's rule, and that of the first Restatement, is similar, allowing consideration of "words or other manifestations of intention forming an agreement, or having reference to the formation of an agreement". 1 Restatement, Contracts, secs. 230, 233 (1936). Such manifestations are given the meaning "which the party making * * * [them] should reasonably expect that the other party would give to them". *Id.* sec. 233; 3 Williston, *supra,* sec. 607, at 1741.

Looking at the circumstances prior to and contemporaneous with the drafting of the closing agreement, we note that the original lease to Chemlawn was not set to expire until the end of 1988. We also note that Moore was not in the retail lawn care business and that Mr. Rink's renegotiated lease with Moore was consummated in 1986, 2 years prior to the expiration of the current lease to Chemlawn. Finally, we note that the 1986 "re-lease" was consummated *during* the period when closing agreement negotiations were ongoing.

Focusing on Ms. Feuer's letter of February 5, 1987, and Mr. Rink's letter of June 10, 1987, we find that a reasonable person would attach respondent's meaning to the language contained in Mr. Rink's letter. In her February 5, 1987, letter, Ms. Feuer stated:

*If* Mr. and Mrs. Atkins renegotiate a lease with Chemlawn, or any other third party, the salvage value can be redetermined *at that time.* However, the Service cannot agree to a *future* salvage value *now,* as you suggested, since the value will depend on the facts and circumstances of the particular transaction. [Emphasis added.]

There can be no question that Ms. Feuer's letter is referring to a *future* re-lease of Mr. Rink's trucks. Mr. Rink's letter (containing language ultimately adopted in the closing agreement)[8] purports to "accurately reflects [sic] the proposal" con-

---

[8] The general contract principle of contra proferentem weighs heavily against petitioners. The principle states that an ambiguous provision in a written document is construed more strongly against the person who selected the language. See, e.g., *United States v. Seckinger,* 397 U.S. 203, 216 (1970); see also Black's Law Dictionary (6th ed. 1990). The language ultimately used

tained in Ms. Feuer's February 5 letter. In addition, Mr. Rink's letter contains the following language with regard to *potential* scenarios wherein the trucks in issue might be released:

We have discussed some "reasonableness" standard, but it might be possible to quantify the matter to each side's satisfaction. For example, *if* the equipment is released for no more than two years, then the 30% salvage value would remain the same, but *if* the lease extension were for three years, then the salvage value would be adjusted to 20%, and *if* it was for four years or more, then the salvage value would be adjusted to zero percent. In the latter situation, this would permit [Mr. Atkins] to take advantage of his elective 10% reduction. [Emphasis added.[9]]

Six months before the above letter was written, Mr. Atkins and Mr. Rink had executed leases with Moore for specified lease terms. In that context, the above language is, at best, misleading since it conveys the impression that a lease might be negotiated in the future for an as-yet-unspecified length of 2, 3, or 4 years or more, even though at the time Mr. Rink wrote this letter, he and Mr. Atkins had already signed their 1986 leases with Moore for specified lease terms. In light of this, petitioners' contention that the possible renegotiation referred to in paragraph 3 of the closing agreement includes a lease that had already been executed is unreasonable. Thus, even if the meaning of paragraph 3 is considered to be ambiguous, ordinary contract principles dictate that we reject petitioners' interpretation.

Finally, even if we were to hold that petitioners' interpretation of the closing agreement was correct, petitioners have failed to establish that the 1986 lease had substance for tax purposes.[10] Significant in this regard is the structure

---

in petitioners' closing agreement comes from Mr. Rink's letter of June 10, 1987, and replaces respondent's alternative. Thus, the above principle dictates that we read the closing agreement in favor of respondent.

[9] We quote letters referring to Mr. Atkins because the arguments of the parties are centered around these letters. This results from the fact that the Atkinses' closing agreement served as the model for petitioners' agreement.

[10] We address this issue over petitioners' objection that it was newly raised at trial by respondent. In fact, respondent pointed out petitioners' burden of proof on this issue in the notice of deficiency:

It is determined that the deduction claimed on your 1986 return as depreciation on Chemlawn Equipment is disallowed in full since you have not established that any amount is deductible in tax year 1986. * * *

Respondent also raised this issue in respondent's pretrial memorandum:

In addition, it is respondent's view that petitioners have not to date satisfied their burden

and sequence of the contractual relationships between petitioner, Moore, and Chemlawn. Pursuant to the terms of its 1980 lease with Moore, Chemlawn had a right to renew the lease arrangement. When Mr. Rink purchased his trucks, they were already subject to Chemlawn's renewal rights under the preexisting lease with Moore. By virtue of this renewal provision, Chemlawn appears to have had the power to effectively nullify the 1986 arrangement between Moore and petitioner. Moore, itself, had the contractual right to unilaterally terminate the 1986 arrangement with petitioner.[11] Ultimately, Mr. Rink's 1986 lease, which was to be effective beginning December 31, 1988, never took effect. It was displaced prior to its effective date by a lease signed in late 1988, which does not even mention the existence of the 1986 arrangement. The 1988 lease also ran for a different time period and specified monthly rental payments different from those specified in the 1986 lease.

An undated letter from Moore proposing a 1986 lease transaction to Mr. Rink supports our conclusion that the 1986 lease had no substance, as does Mr. Rink's own testimony. The letter focuses exclusively on the tax benefits to be gained from the arrangement.[12] At trial, Mr. Rink testified as follows:

of demonstrating that the 1986 lease agreement between petitioners and MOT was of such a nature as to be accorded controlling weight in this controversy, as petitioners urge.

Neither party addresses in detail the mechanism by which a lease with substance would have entitled petitioners to additional deductions for depreciation. Our decision addresses the substance of the 1986 lease solely to determine its effect for purposes of the closing agreement, which states: "if the taxpayers renegotiate a lease with the Chemlawn Corporation or any other third party, then salvage value may be redetermined at that time."

[11] We note that Moore, the purported lessee of the lawn service trucks, was not in the lawn-care business and, in 1986, did not have a commitment from Chemlawn to re-lease the trucks.

[12] The letter states:

Earlier we wrote you that the IRS was taking the position with some investors that the ChemLawn vehicles could not be depreciated to zero during the 8 year base lease term but only to a 30% salvage value. A copy of that letter is attached.

The IRS position was based upon the nature of the ChemLawn lease i.e., that the ultimate disposition of the vehicles after December, 1988 was unknown and therefore as a taxpayer/businessman you weren't currently justified in depreciating the assets beyond the 30% salvage value until there was evidence that your ownership of the equipment would extend beyond the current eight year base lease term.

As we discussed and agreed earlier, Moore, Owen, Thomas and Company will lease your vehicles for two additional years beginning January 1, 1989 at a rental rate that is 70% of your current rental rate.

This arrangement, among other things, should enable you to write off in 1986 any remaining undepreciated basis on your vehicles.

The lease terms proposed in this letter are different than those contained in the 1986 lease document. No explanation for this variance was offered.

In December of 1986, knowing that—or thinking that—we had a settlement on the Chemlawn transaction and the salvage value issue, making the judgment that it was better to enter into a lease in 1986 and take advantage of the higher tax rates—the old tax law rather than the new tax law—and to not lose as much of the tax benefits as I would be required to do if I waited to enter into a lease until 1988, I met with Tom Moore of Moore, Owen, Thomas. Presented him the alternative of entering into a lease in 1986 and he consented to doing it. * * *

From these facts, it is reasonable to conclude that the 1986 lease was without substance and that its terms were never intended to take effect.[13] Rather, it appears to have been designed solely to allow for the earliest possible deduction of whatever undepreciated basis Mr. Rink would have in the trucks after settling the depreciation issue for prior years. If a transaction is entered into solely for tax benefits and without any other purpose, the transaction will be disregarded and the tax benefits denied. *Ronnen v. Commissioner,* 90 T.C. 74, 89 (1988); *Gefen v. Commissioner,* 87 T.C. 1471, 1490 (1986). Petitioners bear the burden of proof on this issue. Rule 142(a); *Kirchman v. Commissioner,* 862 F.2d 1486, 1490 (11th Cir. 1989), affg. *Glass v. Commissioner,* 87 T.C. 1087 (1986). Petitioners have failed to meet their burden of proving that the 1986 lease had any purpose or effect other than tax benefits.

Based upon the foregoing, we hold that petitioners are not entitled to additional depreciation deductions in 1986.

*Decision will be entered under Rule 155.*

---

[13] No one from the Moore organization was called to testify.