T.C. Memo. 2016-204

UNITED STATES TAX COURT

ESTATE OF ROBERT C. DUNCAN, DECEASED, DAN DUNCAN AND JAN
DUNCAN, CO-EXECUTORS, AND JANNETTE DUNCAN, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 1722-08L, 20689-09L.          Filed November 8, 2016.

Melissa L. Ellis, for petitioners.

Thomas Lee Fenner, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, Judge: In these collection due process (CDP) cases, petitioners

seek review pursuant to section 6330(d)(1)[1] of the determination by the Internal

---

[1]All statutory references are to the Internal Revenue Code in effect at all
relevant times. We round all monetary amounts to the nearest dollar.

**[*2]** Revenue Service (IRS or respondent) to uphold notices of intent to levy. The IRS served the levy notices to assist in collecting petitioners' unpaid Federal income tax liabilities for 1996 and 2000. The issues for decision are whether the IRS Appeals Office: (1) failed to verify that the tax in question had been properly assessed or (2) abused its discretion in declining to accept a $40,000 offer-in-compromise (OIC). We sustain respondent's determinations in all respects.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found; the stipulation of facts and the attached exhibits are incorporated by this reference. Petitioners are the Estate of Robert C. Duncan, who died in 2003, and his widow, Jannette Duncan. For convenience, we will use the term "petitioners" to refer to Jannette Duncan and either Robert C. Duncan or his estate (depending on the date on which the relevant act occurred). Robert C. Duncan resided in Texas when he died, and his will was apparently probated in Texas. Jannette Duncan resided in Texas when the petition was filed, as did both coexecutors of Mr. Duncan's estate.

A.  The Examination Phase

Petitioners were the sole partners in a family partnership called RCD Investments, Ltd. (RCD). In 1999 petitioners participated through RCD in a series of

[*3] transactions constituting a Son of BOSS (SoB) tax shelter.[2] RCD thereby generated $4,858,240 of fictitious short-term capital losses for 1999 that were passed through to petitioners' individual return. Petitioners claimed $1,405,887 of this loss as a deduction on their 1999 return and carried forward the remaining $3,452,353 to their 2000 return.

Separately, RCD claimed deductions of approximately $48 million and $49 million, for 2000 and 2001 respectively, for alleged bad-debt losses. These deductions were likewise passed through to petitioners' individual returns. As a result of these alleged losses and various loss carryforwards, petitioners reported a substantial net operating loss (NOL) on their 2001 return. In 2002 petitioners filed a Form 1045, Application for Tentative Refund, claiming a refund attributable to an NOL carryback of $9,952,668 from 2001 to 1996. The IRS processed this claim and in November 2002 issued petitioners a refund of $2,839,881 for 1996.

The IRS selected RCD's 1999-2000 partnership returns for examination. The examination was initially conducted by two separate audit teams: one focused on the SoB transactions and the other focused on the alleged bad-debt losses. The

---

[2]An SoB shelter is a variation of an earlier tax shelter known as BOSS, "bond[s] and options sales strategy." While the scheme had various flavors, the goal was to create for the partners artificially high bases in the partnership, enabling them to claim fictitious losses on their individual returns. See Kligfeld Holdings v. Commissioner, 128 T.C. 192, 194 (2007).

[*4] second team later expanded its examination to include RCD's 2001 partnership return, and both teams expanded their examinations to include petitioners' 1996, 1999, 2000, and 2001 individual returns.

Revenue Agent Metzner (RA1) began work on the SoB examination in May 2004. She immediately sent petitioners a letter notifying them that the IRS had announced a settlement initiative for taxpayers who had participated in SoB transactions. See Announcement 2004-46, 2004-1 C.B. 964. This initiative allowed electing taxpayers to reduce underpayment penalties if they conceded all SoB-related tax benefits before June 21, 2004. Electing taxpayers were required to execute a closing agreement and make "[f]ull payment of the liabilities under this initiative" or "other financial arrangements acceptable to the Service" by the time the closing agreement was signed. Id., 2004-1 C.B. at 965.

Petitioners elected to participate in the settlement initiative and submitted the required election form to RA1 on June 21, 2004. She acknowledged receipt of petitioners' election and requested followup information from them regarding payment arrangements. Pursuant to Announcement 2004-46, supra, on September 24, 2004, petitioners signed Form 13586-A, Settlement Initiative Declaration, reporting $4,858,240 of tax benefits claimed on their 1999-2000 individual returns as attributable to the SoB transactions.

**[*5]** Meanwhile, the bad-debt examination was transferred to RA1 from another revenue agent. In October 2004 petitioners and RA1 agreed to the disallowance of the $48 million bad-debt loss deduction that RCD had claimed for 2000. Given the interplay among the partnership and the individual returns, the disallowed bad-debt loss deduction, the disallowed SoB loss deductions, and the NOL carryforwards and carrybacks, the computation of petitioners' individual tax liabilities for the various years was complex. Numerous iterations of these tax computations followed.

When the dust appeared to have settled, RA1 in December 2004 sent petitioners a Form 906, Closing Agreement on Final Determination Covering Specific Matters, that memorialized the parties' settlement of the SoB transactions, in which they "concede[d] all claimed benefits and attributes from the Son of BOSS transaction" for 1999 and 2000. The agreement also stated that "[t]he taxpayers shall make full payment of their liability for tax, penalties and interest resulting from the application of the foregoing paragraphs, upon returning this executed closing agreement to the IRS."

RA1 concurrently sent petitioners two Forms 4549, Income Tax Examination Changes. On the Form 4549 for 2000, RA1 calculated a $1.9 million deficiency attributable to disallowance of RCD's bad-debt loss deduction and adjust-

[*6] ments to NOL carryforwards and carrybacks; none of this deficiency was attributable to the SoB transactions. On the Form 4549 for 1996, RA1 calculated an overassessment of $2,238,863 attributable largely to NOL carrybacks. Since the IRS had previously issued petitioners a refund of $2,839,881 for 1996, this Form 4549 showed a balance due of $601,018. Finally, RA1 sent to petitioners a Form 870, Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment, reflecting the deficiency for 2000 and the balance due for 1996.

On December 30, 2004, petitioners executed and mailed to RA1 the Form 906 closing agreement implementing the SoB settlement and the Forms 870 and 4549 waiving restrictions on assessment for 1996 and 2000. RA1 noted in her file that the disallowance of the SoB-related loss deductions by itself created no tax liability for 1996 because it operated only to reduce carryforwards and carrybacks. For that reason, the settlement initiative did not require petitioners to make payment or payment arrangements upon execution of the closing agreement. RA1 retired from the IRS on December 31, 2004, and the cases were reassigned to Revenue Agent Smith (RA2).

RA2 received the executed Forms 906, 870, and 4549 on January 3, 2005. The IRS countersigned the closing agreement on January 14, 2005. RA2 sent

**[*7]** petitioners a fully executed copy of the closing agreement on January 24, 2005.

Thereafter much confusion ensued. RA2 discovered (among other errors) that the overassessment for 1996 was incorrect because it ignored a $717,797 refund that petitioners had received on account of another NOL carryback. The revenue officer newly assigned to the SoB portion of the examination, moreover, erroneously concluded (contrary to RA1's determination) that petitioners had violated the terms of the settlement initiative by failing to tender a tax payment for 1996. She recommended that petitioners be removed from the SoB settlement program for this reason, a recommendation to which petitioners strongly objected. On this point IRS management agreed with petitioners, determining that the SoB closing agreement was binding on both parties and could not be set aside absent fraud or the like.

After this additional dust had settled, RA2 determined that petitioners were liable for the following: (a) an $82,858 deficiency for 1996, none of which was attributable to the SoB transactions;[3] (b) a $2,039,736 deficiency for 2000, $739,880 of which was attributable to the SoB transactions; and (c) a penalty of

---

[3]This $82,858 deficiency took into account both of the refunds attributable to the NOL carrybacks that RA1 and RA2 had discovered.

[*8] $73,988 for 2000 (computed at 10% pursuant to the settlement initiative) attributable to the SoB transactions. In April 2006 RA2 sent petitioners updated Forms 4549 reflecting these adjustments. She also sent them a Form 870-PT, Agreement for Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts, reflecting the disallowance of RCD's $48 million bad-debt loss deduction for 2000.

At the bottom of the Form 4549 there is a box captioned "Consent to Assessment and Collection," which includes the following text: "I do not wish to exercise my appeal rights within the Internal Revenue Service or to contest in the United States Tax Court the findings in this report. Therefore, I give my consent to the immediate assessment and collection of any increase in tax and penalties * * * shown above, plus additional interest as provided by law."

On July 18, 2006, petitioners signed the "Consent to Assessment and Collection" on the Forms 4549 for 1996 and 2000. They returned to RA2 these executed forms, along with the executed Form 870-PT. In December 2006 the IRS assessed the tax liabilities to which petitioners had agreed, namely, a $82,858 deficiency for 1996 and a liability of $2,113,724 for 2000 (the $2,039,736 deficiency plus the $73,988 penalty).

**[*9]** B.     The Collection Phase

In an effort to collect petitioners' unpaid 1996 liability, the IRS in March 2007 mailed them Form 1058, Final Notice of Intent to Levy and Your Right to a Hearing.  Settlement Officer Darling (SO1) was assigned to the 1996 liability case.  Petitioners submitted an OIC premised on doubt as to liability, disputing the validity of the 1996 assessment.  They asserted that they had never agreed to this assessment and that the IRS had failed to issue them a notice of deficiency.

In response SO1 provided petitioners a copy of the Form 4549 they had signed on July 18, 2006, which established that they had agreed to the 1996 tax deficiency and waived restrictions on its assessment.  SO1 explained to petitioners that the IRS was not required to send them a notice of deficiency for 1996 because they had waived that requirement by signing this form.  SO1 concluded that petitioners' tax liability for 1996 had been properly assessed and that there was no doubt as to their liability because they had explicitly agreed to it.  She therefore rejected petitioners' OIC and, on December 20, 2007, issued them a notice of determination sustaining the levy for 1996.

In an effort to collect petitioners' unpaid 2000 liability, the IRS in November 2008 sent them a notice of intent to levy on Form 1058.  Petitioners requested a CDP hearing, stating they wished to dispute their underlying tax liability and

[*10] discuss collection alternatives. Settlement Officer Penny (SO2) was assigned to the 2000 liability case.

SO2 informed petitioners that she could not consider a challenge to their underlying tax liability because they had signed a closing agreement (covering the SoB issue) and a Form 4549 (covering all issues) by which they had accepted the 2000 tax liability as determined by the IRS and consented to its assessment. Petitioners did not propose any collection alternatives. On July 31, 2009, SO2 issued petitioners a notice of determination sustaining the levy for 2000.

On January 22, 2008, petitioners timely petitioned for review of the notice of determination for 1996. Their petition raised many points but ultimately two assignments of error. They alleged that: (1) the assessment for 1996 was invalid because the period of limitations for assessment had lapsed before the tax was assessed and (2) SO1 had failed to verify that all applicable procedural requirements were met.

On August 31, 2009, petitioners timely petitioned for review of the notice of determination for 2000. Although the petition alleged 40 discrete errors, it chiefly focused on assertions that the assessment for 2000 was invalid and that SO2 had not given adequate consideration to collection alternatives. On April 2, 2010, we consolidated the two cases for trial, briefing, and opinion.

**[*11]** While the cases were pending in this Court, petitioners submitted to the IRS a new OIC of $60,000. Believing that this offer had been submitted solely to delay collection, the IRS returned it to petitioners without affording them a right to administrative appeal. Respondent later had second thoughts about this and, on December 17, 2013, the parties jointly moved to remand the cases to the IRS Appeals Office for a supplemental CDP hearing. We granted that motion.

On remand, a new settlement officer (SO3) was assigned to evaluate petitioners' offer. They submitted a copy of their OIC, which offered to discharge tax liabilities then exceeding $3 million (including interest) by paying $60,000. They also submitted a schedule of assets and liabilities that showed a net worth of $8,031,592 as of January 2003. They later submitted a Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals, showing net assets and expected future income of $545,897 as of 2014. Puzzled by the asserted 93% decline in their net worth, SO3 asked them to explain these calculations and to submit a new OIC for consideration.

Petitioners submitted a new OIC of $40,000 based on "Doubt as to Collectibility with Special Circumstances." Recognizing that their reasonable collection potential (RCP) (even if only $545,897 as alleged) substantially exceeded their offer, petitioners asserted that this discrepancy was justified by "special circum-

[*12] stances." The alleged "special circumstances" included Mrs. Duncan's age (91), her asserted lack of future income, monthly losses she had incurred on an office building, and monthly payments of $11,000 that she was making on life insurance policy loans.

SO3 determined that the real estate losses (attributable mostly to depreciation) and policy loan repayments (which appeared to benefit petitioners and their family members) could not be taken into account in evaluating their ability to pay. SO3 asked for detailed statements showing what had happened to millions of dollars of assets, previously shown on their balance sheet, which were no longer there. In particular, SO3 asked for information about the beneficiaries of the life insurance policies and an accounting of all policy loans and repayments.

Petitioners' assets included overlapping interests in numerous closely held entities, such as partnerships and family trusts, which engaged in numerous related-party transactions. These overlapping interests complicated a precise determination of petitioners' net worth. For this reason, SO3 was unable to determine their RCP as an exact dollar amount.

However, SO3 determined that petitioners' RCP was sufficiently large to exceed their $40,000 offer by a very wide margin. He determined that petitioners, since incurring their 1996 and 2000 tax liabilities, had dissipated assets of at least

**[\*13]** $3.4 million; that their remaining assets exceeded $7.6 million; and that their remaining assets vastly exceeded their liabilities. Petitioners responded with an appraisal report purporting to value their assets at less than $200,000; SO3 rejected this report as factually deficient in numerous respects.

On December 22, 2014, SO3 issued a supplemental notice of determination rejecting petitioners' $40,000 OIC and sustaining the levies to collect their 1996 and 2000 tax liabilities. He concluded that petitioners had sufficient assets to pay their 1996 and 2000 tax liabilities in full; that there were no "special circumstances" that would justify acceptance of their $40,000 offer; and that acceptance of their offer would not be in the best interests of the United States.[4]

We set these cases for trial in Dallas in October 2015 to review the supplemental notice of determination. Before trial the parties filed a stipulation of settled issues, agreeing that the IRS assessments, if valid, were timely for both years.

OPINION

Section 6330(d)(1) does not prescribe the standard of review that this Court must apply in reviewing an IRS administrative determination in a CDP case. The general parameters for such review are marked out by our precedents. Where the

---

[4]SO3 noted that the U.S. Department of Justice had commenced litigation against a trustee of the estate for improperly distributing assets without paying the estate's tax liabilities.

**[*14]** validity of the underlying tax liability is at issue, the Court reviews the IRS' determination de novo. Goza v. Commissioner, 114 T.C. 176, 181-182 (2000). Where the taxpayer's underlying tax liability is not at issue, the Court reviews the IRS decision for abuse of discretion. Id. at 182. Abuse of discretion exists when a determination is arbitrary, capricious, or without sound basis in fact or law. Murphy v. Commissioner, 125 T.C. 301, 320 (2005), aff'd, 469 F.3d 27 (1st Cir. 2006). A taxpayer may dispute her underlying tax liability in a CDP case only if she did not receive a notice of deficiency or otherwise have a prior opportunity to contest that liability. Sec. 6330(c)(2)(B). The term "underlying tax liability" includes the total amount of tax, penalties, and interest assessed for the relevant year. Callahan v. Commissioner, 130 T.C. 44 (2008); see also Katz v. Commissioner, 115 T.C. 329, 339 (2000).

The validity of petitioners' underlying tax liabilities is not at issue here. SO1 and SO2 concluded that petitioners could not challenge their underlying liability for 1996 or 2000 because they had signed Forms 4549 agreeing to the tax liabilities in question. SO3 concurred in this conclusion. Petitioners thus waived their right to challenge these liabilities at the IRS Appeals Office or in this Court. See Aguirre v. Commissioner, 117 T.C. 324, 327 (2001); Hall v. Commissioner, T.C. Memo. 2013-93, at *10-*11. We accordingly review the IRS' determina-

[*15] tions for abuse of discretion only.  Sego v. Commissioner, 114 T.C. 604, 610 (2000).

In deciding whether SO3 in the supplemental notice of determination abused his discretion in rejecting petitioners' OICs and sustaining the levies, we consider whether he:  (1) properly verified that the requirements of applicable law or administrative procedure had been met; (2) considered any relevant issues petitioners raised; and (3) determined whether the proposed collection action "balances the need for the efficient collection of taxes" against petitioners' legitimate concern that the collection action be no more intrusive than necessary.  See sec. 6330(c)(3).

A.    Validity of the Assessments

Petitioners' principal contention is that, during the initial CDP hearings, SO1 and SO2 failed to verify that the tax liabilities in question had been properly assessed.  Petitioners advance two arguments to support this contention:  that the IRS failed to issue notices of deficiency before making the assessments; and that the assessments were barred by the SoB closing agreement.  Neither argument has merit.

As a rule, the IRS may not assess a tax deficiency unless it has first mailed the taxpayer a notice of deficiency, enabling her to challenge the deficiency in this

**[\*16]** Court before the IRS assesses the tax and proceeds to collect it. Sec. 6213(a); McKay v. Commissioner, 89 T.C. 1063, 1067 (1987) (referring to the notice of deficiency as a taxpayer's "ticket to the Tax Court"), aff'd, 886 F.2d 1237 (9th Cir. 1989). But there are well-established exceptions to this rule. One such exception appears in section 6213(d), which allows the IRS to assess a deficiency without issuing a notice of deficiency if a taxpayer waives restrictions on assessment.

A taxpayer can waive restrictions on assessment in various ways. One way of doing this is by executing the "Consent to Assessment and Collection" that appears on Form 4549. See Perez v. United States, 312 F.3d 191, 197 n.23 (5th Cir. 2002); Aguirre, 117 T.C. at 327. Petitioners did that here: On the Forms 4549 for 1996 and 2000 they explicitly waived their right "to contest in the United States Tax Court" the liabilities appearing on those Forms and gave their "consent to the immediate assessment and collection" of those liabilities. Under section 6213(d), petitioners thus waived their right to receive a notice of deficiency for either year.

Petitioners' second argument is based on the closing agreement. Although the SoB settlement initiative generally required electing taxpayers to make payment when executing the closing agreement, SO1 did not require payment or payment arrangements from petitioners at that time. Petitioners accordingly argue

**[*17]** that the closing agreement had an implicit term that no tax or penalty would be due. In petitioners' view the IRS violated the closing agreement when it later assessed, for the year 2000, a deficiency of $739,880 and a penalty of $73,988 on account of the SoB transactions.

Section 7121(a) permits the IRS to enter into closing agreements, which are final and conclusive and bind the parties as to matters agreed upon. Sec. 7121(b); Urbano v. Commissioner, 122 T.C. 384, 393 (2004). The IRS has prescribed two forms of closing agreements. See sec. 301.7121-1(d), Proced. & Admin. Regs. One type, completed on Form 866, Agreement as to Final Determination of Tax Liability, conclusively determines a taxpayer's liability for a particular year or years. See Urbano, 122 T.C. at 393; Zaentz v. Commissioner, 90 T.C. 753, 760-761 (1988); Rev. Proc. 68-16, 1968-1 C.B. 770. The second type, completed on Form 906, finally determines one or more "specific matters" that affect the taxpayer's liability. See Urbano, 122 T.C. at 393; sec. 601.202(b), Statement of Procedural Rules. A Form 906 closing agreement does not determine the taxpayer's final liability for any particular year but simply binds the parties to the tax treatment of the "specific matters" upon which they have agreed. Zaentz, 90 T.C. at 761; see Estate of Magarian v. Commissioner, 97 T.C. 1, 7 (1991).

[*18] Petitioners executed a "specific matters" closing agreement on a Form 906 in which they "concede[d] all claimed benefits and attributes from the Son of BOSS transaction" for 1999 and 2000. This agreement did not address any other items affecting their tax liabilities (such as the claimed bad-debt losses), and it made no reference to the dollar amount of their tax liability for any year. The agreement simply provided that, in determining petitioners' tax liabilities for the relevant years, their concession of all SoB tax benefits would be given full force and effect.

Like other closing agreements executed pursuant to the SoB settlement initiative, petitioners' agreement stated that "[t]he taxpayers shall make full payment of their liability for tax, penalties and interest resulting from the application of the forgoing paragraphs, upon returning this executed closing agreement to the IRS." When accepting the closing agreement from petitioners, the IRS did not require any tax payment because it believed, at the time, that disallowance of the SoB tax benefits would operate merely to reduce carryforwards and carrybacks. The IRS later discovered various errors and omissions that required recalculation of petitioners' tax liabilities for 1996 and 2000. This recalculation revealed that a portion of the 2000 deficiency, $739,880, was in fact attributable to the disallowed

[*19] SoB tax benefits, and the IRS computed a 10% penalty, $73,988, accordingly. Nothing in the closing agreement prevented the IRS from doing this.

Closing agreements are interpreted under ordinary principles of contract law. Smith v. United States, 850 F.2d 242, 245 (5th Cir. 1988); United States v. Lane, 303 F.2d 1, 4 (5th Cir. 1962). We confine our view to the "four corners" of the agreement unless it is ambiguous as to essential terms. Silverman v. Commissioner, 105 T.C. 157, 161 (1995), aff'd, 86 F.3d 260 (1st Cir. 1996); Rink v. Commissioner, 100 T.C. 319, 325 (1993), aff'd, 47 F.3d 168 (6th Cir. 1995). The closing agreement at issue here is unambiguous: It makes no reference to petitioners' overall tax liability for any year, and it therefore does not foreclose the IRS from determining liabilities in any particular amount.

Petitioners desire to read into the closing agreement an implicit representation by the IRS that, if it did not require them to tender a tax payment upon execution of the Form 906, it would not determine a tax deficiency attributable to the SoB transactions. But a closing agreement binds the parties only as to the matters expressly agreed upon therein. See sec. 7121(b); Zaentz, 90 T.C. at 761. The IRS made no representation or promise of the sort petitioners imagine; it could not have done so, because a "specific matters" closing agreement does not address the taxpayer's overall liability for any year at issue. The clause in the closing agree

[*20] ment requiring that payment be tendered was designed to protect the fisc; petitioners improperly seek to convert this shield into a sword to bind the IRS to a promise that it never made.

In sum, we conclude that the IRS Appeals Office correctly verified that petitioners' tax liabilities for 1996 and 2000 had been properly assessed. Because petitioners explicitly consented to those assessments by executing the respective Forms 4549, a notice of deficiency was not required as a prerequisite to assessment for either year. And there is nothing in the SoB closing agreement that barred assessment of the tax deficiencies and penalties to which petitioners had expressly agreed.

B.    Petitioners' OIC

Section 7122(a) authorizes the IRS to compromise an outstanding tax liability. The regulations set forth three grounds for such compromise: (1) doubt as to liability; (2) doubt as to collectibility; or (3) promotion of effective tax administration. Sec. 301.7122-1, Proced. & Admin. Regs. Petitioners initially based their OIC on doubt as to liability, urging that the 1996 and 2000 assessments were invalid. The IRS Appeals Office rejected that theory for the reasons set forth above.

At the supplemental CDP hearing, petitioners based their OIC on doubt as to collectibility and "special circumstances." The Secretary may compromise a tax

**[\*21]** liability on the basis of doubt as to collectibility where the taxpayer's assets and income render full collection unlikely. Id. para. (b)(2). Conversely, the IRS may reject an OIC when the taxpayer's RCP exceeds the amount he proposes to pay. See Johnson v. Commissioner, 136 T.C. 475, 486 (2011), aff'd, 502 F. App'x 1 (D.C. Cir. 2013). Generally, Appeals officers are directed to reject offers substantially below the taxpayer's RCP unless "special circumstances" justify acceptance of such an offer. See Fairlamb v. Commissioner, T.C. Memo. 2010-22; Rev. Proc. 2003-71, sec. 4.02(2), 2003-2 C.B. 517, 517.

We do not independently review the reasonableness of the taxpayer's proposed offer. Our review is limited to ascertaining whether the decision to reject that offer was arbitrary, capricious, or without sound basis in fact or law. Murphy, 125 T.C. at 320. We do not substitute our judgment for the settlement officer's as to the acceptability of any particular offer. See, e.g., Johnson, 136 T.C. at 488.

SO3 did not act arbitrarily or capriciously in determining that petitioners' RCP exceeded their $40,000 offer. Petitioners acknowledged that their net worth in 2003 exceeded $8 million. SO3 determined that petitioners during the intervening years had dissipated at least $3.4 million of assets that could have been used to pay their 1996 and 2000 tax liabilities. He did not abuse his discretion in determining that the values of these assets should be included in the calculation of

[*22] their RCP. See id. at 487; Taggart v. Commissioner, T.C. Memo. 2013-113;

Internal Revenue Manual (IRM) pt. 5.8.5.18 (Sept. 30, 2013). Even ignoring

dissipated assets, petitioners acknowledged that their RCP was at least $545,897,

which exceeded their offer by more than $500,000.[5]

Since petitioners' RCP vastly exceeded their offer, SO3 was directed to re-

ject that offer in the absence of "special circumstances." Rev. Proc. 2003-71, sec.

4.02(2). "Special circumstances" are defined as: (1) facts demonstrating that the

taxpayer would suffer "economic hardship" if the IRS were to collect from him an

amount equal to the RCP; and (2) compelling public policy or equity considera-

tions that provide sufficient basis for compromise. See Murphy, 125 T.C. at 309;

McClanahan v. Commissioner, T.C. Memo. 2008-161; IRM pt. 5.8.4.2(4) (June 1,

2010).

On their Form 433-A petitioners alleged that petitioner Jannette Duncan is

age 91, that she has limited future earning potential, and that she was paying

$11,253 monthly on life insurance policy loans. SO3 did not abuse his discretion

in determining that the loan repayments (which appeared to benefit petitioners and

---

[5]Petitioners repeatedly assert that SO3 erred by failing to determine their exact RCP. Determination of their exact RCP would be a meaningless exercise where (as here) the taxpayers admitted that their RCP exceeded their offer by at least 1,250%.

**[*23]** their family members) should be ignored in assessing their ability to pay. And because petitioners failed to adduce facts setting forth Jannette's current financial situation with any specificity, the SO did not abuse his discretion in determining that they had failed to establish the grave level of "economic hardship" that the regulations require.[6]

Finally, SO3 did not abuse his discretion in concluding that petitioners had failed to show any compelling public policy or equity considerations that would justify compromising their liability. Quite the contrary: The estate's dissipation of more than $3 million of assets demonstrated a blatant disregard of their Federal tax obligations. SO3 was amply justified in concluding that acceptance of petitioners' $40,000 offer was not in the best interests of the United States. See IRM pt. 5.8.5.18(3).[7]

---

[6]Factors indicating "economic hardship" include: (1) a long-term illness, medical condition, or disability that renders the taxpayer incapable of earning a living, where it is "reasonably foreseeable that taxpayer's financial resources will be exhausted providing for care and support during the course of the condition"; (2) a situation where the taxpayer's monthly income is exhausted by providing for care of dependents without other means of support; and (3) a situation where liquidation of assets would render the taxpayer unable to meet basic living expenses. Sec. 301.7122-1(c)(3)(i), Proced. & Admin. Regs.; Internal Revenue Manual pt. 5.8.11.2.1(6) (Sept. 23, 2008). Petitioners neither alleged nor proved any of these conditions.

[7]The IRS has specified certain situations that may warrant rejection of an

(continued...)

[*24] Finding no abuse of discretion in any respect, we will sustain the proposed

collection action.  To reflect the foregoing,

<u>Decisions will be entered</u>

<u>for respondent</u>.

---

<sup>7</sup>(...continued)
offer as not being in the best interests of the Government.  These situations include (among other things) failure to account for dissipated assets.  IRM pt. 5.8.5.18(3) (Sept. 30, 2013).  The U.S. Department of Justice commenced suit against the estate for precisely ths reason.  <u>See</u> <u>supra</u> note 4.