# United States Tax Court

T.C. Memo. 2025-71

ARDEN ROW ASSETS, LLC, NATURAL AGGREGATES PARTNERS, LLC, PARTNERSHIP REPRESENTATIVE,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket No. 3817-23.                                  Filed July 8, 2025.

————————

*Daniel A. Rosen*, *Daniel B. Wharton*, *Michael B. Coverstone*, *Jay R. Nanavati*, *Michael Todd Welty*, *Andrew W. Steigleder*, *Lyle B. Press*, *Macdonald A. Norman*, *Merima Mahmutbegovic*, and *Andrew M. Weiner*, for petitioner.

*Vivian Bodey*, *Brandon M. Chavez*, *William C. Bogardus*, *Daniel C. Chavez*, *Kristin H. Joe*, *Matthew A. Cappel*, *Alei A. Carrington*, *Brittany M. Reid*, and *Nick G. Nilan*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, *Judge*:  Arden Row Assets, LLC (Arden Row), claimed a $57,080,000 noncash charitable contribution deduction for its short taxable year December 11 to 31, 2018 (2018 taxable year), for the grant of a conservation easement (easement deduction), which respondent disallowed in its entirety. During this proceeding the parties engaged in settlement discussions and exchanged letters for the purpose of reaching a settlement. Petitioner has filed a Motion to Enforce Settlement asserting that the exchange of letters resulted in a binding agreement. Respondent argues that the exchanged letters did not result in a binding agreement. We hold that the parties did not enter into a binding agreement.

[*2]                          FINDINGS OF FACT

The findings of fact are based on the parties' Stipulations of Facts with attached Exhibits, testimony at an evidentiary hearing, and Exhibits admitted at the hearing.

Arden Row is treated as a partnership for federal tax purposes and is subject to the partnership audit and litigation procedures enacted by the Bipartisan Budget Act of 2015 (BBA), Pub. L. No. 114-74, 129 Stat. 584, for its 2018 taxable year. Natural Aggregates Partners, LLC (Natural Aggregates), is Arden Row's partnership representative. *See* § 6223(a) (requiring a partnership to designate a partnership representative under the BBA).[1] Matthew S. Kaynard is the designated individual. *See* Treas. Reg. § 301.6223-1(b)(3) (requiring a partnership to have a designated individual where the partnership representative is an entity). When the Petition was timely filed, Arden Row's principal place of business was in Alabama. *See* § 6234(a).

I.      *Arden Row Transaction*

Natural Aggregates is owned, directly or indirectly, by Matthew Ornstein and Frank Schuler. The two men are real estate professionals. From 2012 to 2018 they organized, promoted, and implemented approximately 138 syndicated and nonsyndicated conservation easement transactions (Ornstein-Schuler transactions). Mostly, they conducted these activities through Ornstein-Schuler Investments, LLC (OSI), which they coowned, but also used other entities in which they held interests (collectively, related entities). They retained minority interests, directly or indirectly, in the partnerships that engaged in the syndicated conservation easement transactions, and their related entities served as the tax matters partner or partnership representative for each partnership. During 2018 Mr. Kaynard was OSI's chief operating officer and general counsel.

From 2012 to 2018 Messrs. Ornstein and Schuler also engaged in at least 15 conservation easement transactions for which they did not seek outside investors, i.e., the transactions were nonsyndicated. In 2018 they formed Natural Aggregates to engage in nonsyndicated conservation easement transactions. They owned nearly all of the

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, and regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times.

**[\*3]** partnerships used to donate the conservation easements in the nonsyndicated transactions.

On December 11, 2018, Underwood Assets, LLC (Underwood), an entity owned by unrelated individuals, contributed 208.04 acres of real property to Arden Row for a 100% interest. On December 14, 2018, Natural Aggregates acquired 98% of Arden Row. The parties did not stipulate the manner of acquisition. However, Schedule M–2, Analysis of Partners' Capital Accounts, attached to Arden Row's 2018 Form 1065, U.S. Return of Partnership Income, shows cash capital contributions of $110,900. The owners of Underwood who contributed real property to Arden Row owned the remaining 2%.

On December 19, 2018, Arden Row donated a conservation easement to a qualified section 501(c)(3) organization and claimed a $57,080,000 easement deduction on its 2018 partnership return. Natural Aggregates is the investment-tier partnership in the Arden Row transaction.

During 2018 Natural Aggregates owned 98% interests in eight entities including Arden Row and Kellum Resources, LLC (Kellum Resources), which also engaged in a conservation easement transaction during 2018. Kellum Resources has a case docketed before this Court at No. 2585-23 involving the disallowance of a $48,696,199 easement deduction. Natural Aggregates is Kellum Resources' partnership representative, and Michael Todd Welty of Todd Welty, P.C. (Welty PC), and other Welty PC attorneys are counsel in that case. Messrs. Ornstein and Schuler stopped promoting syndicated conservation easement transactions in early 2019.

II. *Settlement Discussions*

At least 128 cases have been filed with this Court involving Ornstein-Schuler transactions (Ornstein-Schuler cases) including this case. Welty PC, counsel for petitioner in this case, has represented the tax matters partner or partnership representative in over 120 Ornstein-Schuler cases. Mr. Welty is Welty PC's principal. From April 2019 to the date of the evidentiary hearing in this case, Mr. Welty spent approximately 75% of his work hours on matters for Mr. Ornstein, Mr. Schuler, and OSI including matters relating to the Ornstein-Schuler transactions. He participated in settlement discussions and was responsible for evaluating settlement proposals and recommending to clients whether to pursue the proposals. Welty PC attorney Macdonald

[*4] Norman represented petitioner during the audit, drafted the Petition, and prepared for litigation. Former Welty PC attorney Kevin Johnson worked on trial preparation, including discovery. Lyle Press also worked on the Ornstein-Schuler cases.

Around April 2019 Mr. Welty contacted a manager in the Internal Revenue Service (IRS) Examinations Unit to discuss settling the Ornstein-Schuler cases. Around that time attorneys from Skadden, Arps, Slate, Meagher & Flom LLP (Skadden Arps), including Armando Gomez, began representing the partnerships that claimed the easement deductions and joined Mr. Welty in settlement discussions with the IRS. Mr. Gomez has not filed an entry of appearance in this case. With the addition of the Skadden Arps attorneys, counsel changed tactics and approached the IRS National Office of Chief Counsel (National Office) to discuss a global settlement of the Ornstein-Schuler cases. Settlement discussions continued during 2019 and 2020. However, the IRS had not yet completed the audits of most Ornstein-Schuler partnership returns, and the National Office declined to pursue a settlement at that time. Within the National Office, there is a group of management-level attorneys assigned to oversee conservation easement cases, which we refer to as the Oversight Committee.

III.    *IRS Settlement Initiative*

On June 25, 2020, the IRS announced a settlement initiative for taxpayers with syndicated conservation easement cases pending before this Court. I.R.S. News Release IR-2020-130 (June 25, 2020). On October 1, 2020, the IRS issued guidance setting forth the terms of the initiative. I.R.S. Chief Counsel Notice CC-2021-001 (Oct. 1, 2020). The IRS offered settlements that disallowed the easement deductions in their entirety and allowed deductions of out-of-pocket costs that investors incurred to participate in the easement transactions (investor out-of-pocket costs). The IRS offered to reduce penalties to 10% to 20% but also stated that it would concede penalties if it could not establish compliance with supervisory approval under section 6751(b). The initiative was not available to individuals who organized, marketed, or implemented syndicated conservation easement transactions, referred to in the Notice as Category One partners. In the Notice the IRS warned that taxpayers should not expect to settle their docketed cases on better terms. Under the initiative, investors were required to substantiate their out-of-pocket costs and to finalize the settlements by executing closing agreements, and the partnerships were required to consent to the entry of decisions in this Court. Mr. Welty was familiar with the

[*5] terms of the 2020 settlement initiative. However, investors who engaged in the Ornstein-Schuler transactions were not offered the settlement because their returns were still under audit.

On July 13, 2022, Mr. Gomez again met with the National Office including Area Counsel Robert Dillard to propose a global settlement for approximately 128 Ornstein-Schuler partnerships including partnerships with docketed cases and ongoing audits (July 2022 proposal). The proposal generally followed the 2020 settlement initiative: a concession of the easement deduction in its entirety, a deduction for investor out-of-pocket costs, and a reduction of the penalties to 10%. Mr. Gomez proposed that Messrs. Ornstein and Schuler receive the same settlement terms, which was inconsistent with the 2020 settlement initiative because they are Category One partners. At Mr. Dillard's request, Mr. Gomez identified 138 syndicated and 15 nonsyndicated transactions that Messrs. Ornstein and Schuler had implemented.

For settlement purposes Skadden Arps maintained a spreadsheet of the amounts of easement deductions and investor out-of-pocket costs for the Ornstein-Schuler transactions. In an August 19, 2022, letter to Mr. Dillard, Mr. Gomez stated that the July 2022 proposal would result in the disallowance of over $4 billion in easement deductions from 128 Ornstein-Schuler syndicated transactions and "would facilitate the collection of over $1.5 billion from more than 2,000 separate investors." He further estimated that Messrs. Ornstein and Schuler would owe approximately $150 million in additional tax, interest, and penalties. In November 2022 Mr. Dillard informed Mr. Gomez that the IRS did not agree to the July 2022 proposal but was amenable to continuing settlement discussions consistent with, but not more favorable than, the 2020 settlement initiative.

IV.    *Issuance of Notice of Final Partnership Adjustment*

On February 13, 2023, respondent mailed a Notice of Final Partnership Adjustment (FPA) for Arden Row that disallowed the $57,080,000 easement deduction in its entirety and determined an imputed underpayment of income tax of $21,119,600. In the alternative respondent determined that Arden Row was entitled to an easement contribution deduction of $230,100 or $340,578. He also determined penalties of over $8.4 million, which he has conceded for noncompliance with section 6751(b). Discussions for a global settlement continued after respondent issued the FPA. Mr. Gomez continued to advocate a global

[*6] settlement that disallowed the easement deductions in their entirety but allowed investors to deduct their out-of-pocket costs.

V.     *Backdated Supervisory Penalty Approval Form*

In early 2023 Welty PC learned that IRS personnel might have backdated a supervisory penalty approval form in a different easement case. *See LakePoint Land II, LLC v. Commissioner* (*LakePoint*), No. 13925-17 (T.C. filed June 22, 2017). In mid-March 2023 Mr. Gomez and Mr. Welty met with the National Office to discuss the backdated form in *LakePoint*.

Petitioner did not assert respondent's noncompliance with section 6751(b) in its Petition filed on March 21, 2023. At some point Welty PC discovered that the IRS might have backdated the penalty approval form for the penalties asserted in this case, but the record does not establish when Welty PC made this discovery. On July 26, 2023, Mr. Johnson of Welty PC sent informal discovery requests to respondent relating to supervisory penalty approval. Respondent's counsel Kristin Joe requested additional time to respond, but Mr. Johnson refused, and on August 16, 2023, petitioner filed a Request for Admissions on the issue.

On August 29, 2023, the Court issued an opinion in *LakePoint* holding that IRS personnel had backdated the penalty approval form. It further held the Commissioner subject to sanctions for filing a false declaration relating to the approval, the amount of which would be determined at a later date. *LakePoint*, T.C. Memo. 2023-111. The next day Mr. Gomez met with the National Office and proposed a settlement in *LakePoint* that disallowed the easement deduction in its entirety, allowed a deduction of investor out-of-pocket costs, and provided that the Commissioner concede all penalties.[2] The National Office agreed and suggested using the amount of the cash capital contributions shown on Schedule M–2 of the investment-tier partnership's return as the amount of investor out-of-pocket costs instead of requiring investors to substantiate their costs. The National Office indicated that the Commissioner had used the investment-tier partnership's Schedule M–2 as an approximation of investor out-of-pocket costs for settlements in other syndicated easement cases.

---

[2] The Wall Street Journal published an article about the backdated penalty approval forms in this and other cases on September 29, 2023. *See* Editorial, *A Case of Tax Fraud—at the IRS*, Wall St. J., Sept. 29, 2023, at A12.

**[\*7]** The parties later decreased the amount of deduction from the amount shown on Schedule M–2 to exclude the out-of-pocket costs of Messrs. Ornstein and Schuler and their related entities. Messrs. Ornstein and Schuler and their related entities were not entitled to deduct their out-of-pocket costs because they were Category One partners as defined in the 2020 settlement initiative. As part of the settlement the taxpayer in *LakePoint* agreed not to seek an award for attorney's fees and to withdraw a request under the Freedom of Information Act for documents relating to supervisory penalty approval. *LakePoint* was Welty PC's first settlement of an Ornstein-Schuler transaction.

VI.    *Schedule M–2 as a Proxy for Investor Out-of-Pocket Costs*

For syndicated conservation easement transactions, the amount of cash capital contributions shown on the investment-tier partnership's Schedule M–2 generally approximates investor out-of-pocket costs. In a typical syndicated transaction, two entities are formed, one to hold the real property and donate the easement, and a second to promote the easement transaction to investors. The latter entity is the investment-tier partnership. The investors contribute cash capital to the investment-tier partnership in exchange for interests in the partnership and are promised easement deductions that significantly exceed their cash investments. The investment-tier partnership uses the cash to purchase a majority interest in the entity holding the real property and then votes to grant the conservation easement.

Under this structure the amount of the investors' cash capital contributions to the investment-tier partnership, which is shown on the investment-tier partnership's Schedule M–2, generally approximates the investors' out-of-pocket costs to engage in the syndicated conservation easement transaction although it may not capture all investor costs. However, for nonsyndicated easement transactions there is no infusion of cash capital from the sale of interests in the investment-tier partnership to investors who want to claim the promised easement deduction. There may not be any outside investors. Accordingly, for a nonsyndicated transaction the investment-tier partnership's Schedule M–2 may not approximate investor out-of-pocket costs incurred to participate in the easement transaction especially where the investment-tier partnership owned multiple entities.

[*8] VII.   *Exchange of Letters*

Around September 2023, after the Court's opinion in *LakePoint*, the National Office told Ms. Joe and her cocounsel Matthew Cappel to review the supervisory penalty approval in this case. Ms. Joe and Mr. Cappel determined that there was an issue with respondent's compliance with section 6751(b). Ms. Joe alerted the National Office, and the National Office decided to concede the penalties. On October 13, 2023, Ms. Joe notified Mr. Johnson of Welty PC that respondent was conceding the penalties for possible noncompliance with section 6751(b). She also objected to outstanding discovery requests relating to section 6751(b) compliance as moot.

Shortly after respondent conceded the penalties, the National Office decided to propose a settlement in this case and other Ornstein-Schuler cases that would allow deductions for investor out-of-pocket costs but disallow the easement deductions in their entirety. Respondent also proposed to reduce or, alternatively, to concede penalties if he could not establish compliance with section 6751(b). For the cases in which respondent conceded the penalties, the National Office created a template letter to propose the settlements (template). On October 17, 2023, Kimberly Mattonen, an attorney with the Oversight Committee, emailed the template to Ms. Joe and other trial attorneys who were assigned to cases in which the Commissioner conceded penalties. In her email Ms. Mattonen wrote that the template was to be used for syndicated easement cases. She instructed the trial attorneys to complete highlighted items in the template that related to each case and to send the letters to opposing counsel as soon as possible. In pertinent part the template required the trial attorneys to "ADD AMOUNT FROM SCHEDULE M–2, CAPITAL CONTRIBUTED (CASH) LINE." The template directed that "[i]n a BBA case, [counsel] must ask for the filed version of the investment-tier's Form 1065, including the schedu[l]e M–2" to determine the amount of the deduction for investor out-of-pocket costs.

On October 16, 2023, Ms. Joe told Mr. Johnson that respondent would be making a settlement offer. Later, she requested a copy of Natural Aggregates' Schedule M–2 and explained that respondent would use the amount of the cash capital contributions shown on Schedule M–2 for the amount of the deduction of investor out-of-pocket

[*9] costs.[3] On October 23, 2023, Mr. Johnson provided a copy of Schedule M–2 to Ms. Joe, and she began to complete the template letters. Natural Aggregates' Schedule M–2 did not disclose that it owned eight entities.

Ms. Joe determined from a review of Form 886–A, Explanation of Items, which was part of the revenue agent's report, that Natural Aggregates owned multiple entities and had engaged in more than one conservation easement transaction during 2018. She did not follow up with the Oversight Committee about the impact of these facts on the use of the template. She believed that she had very specific instructions to use the template. She was changing IRS offices and moving, and she wanted to send the letter before she took leave for the move.

Ms. Joe provided the draft letter to her supervisor Steven Woodliff for review. Mr. Woodliff did not have experience with easement transaction cases or partnership cases. With Ms. Joe's assistance, he confirmed that the proposed deduction matched the amount shown on Natural Aggregates' Schedule M–2. He also confirmed that the letter followed the template. He asked members of the Oversight Committee whether anyone wanted to review the letter before it was sent. The only response that he received was to send it to the Committee if he thought it was necessary. Mr. Woodliff did not know that the Arden Row transaction was nonsyndicated and did not have outside investors or did not understand the impact of those facts. Ultimately, Mr. Woodliff did not forward the letter to the Oversight Committee for review.

A.    *Respondent's Purported Offer*

On October 24, 2023, respondent sent Mr. Johnson a letter that was based on the template. Both Ms. Joe and Mr. Woodliff signed the letter. The letter incorrectly describes this case as involving a "syndicated conservation easement transaction." The letter further states:

> This letter is a follow-up to our discussion on October 16, 2023 and sets forth terms upon which the Commissioner . . . would agree to resolve the docketed matter:

---

[3] Respondent's records for this case would not have included Natural Aggregates' return because it is not relevant to the easement deduction.

[*10]  1. Partnership is not entitled to a charitable contribution deduction claimed for a conservation easement of $57,080,000.

2. Partnership is entitled to an "other deduction" of $24,586,319. This other deduction approximates out-of-pocket costs (i.e., the estimated amount partners paid for their interest in an investment-tier partnership). Respondent determined this other deduction by reference to the investment-tier partnership's Schedule M–2, Capital Contributed (Cash).

3. Respondent concedes all penalties . . . because he has not established that the procedural requirements of I.R.C. § 6751(b) were satisfied. Respondent and Petitioner agree that no negative inference regarding the merits of the penalties should be drawn from Respondent's concession of the penalties in the instant case.

4. Interest will accrue as required by law.

5. Respondent and Petitioner agree to resolve this case by filing a decision document.

For convenience, we refer to this letter as the settlement proposal. The settlement proposal did not specify a deadline for petitioner to respond. On October 30, 2023, Welty PC asked Ms. Joe for an additional 30 days to respond; Ms. Joe agreed.

From October 17 to 26, 2023, the Commissioner sent at least eight letters in other Ornstein-Schuler cases to Welty PC with substantially similar terms that proposed deductions for investor out-of-pocket costs determined by reference to the investment-tier partnership's Schedule M–2. These other cases involved syndicated conservation easement transactions and had outside investors. Not all conceded penalties. On October 31, 2023, attorneys from Skadden Arps and Welty PC including Messrs. Gomez and Welty again met with the National Office to discuss a global settlement of the Ornstein-Schuler cases. The National Office declined to pursue a global settlement.

B.     *Petitioner's Acceptance*

When Mr. Johnson received the settlement proposal, he recognized that Natural Aggregates did not have investor out-of-pocket

[*11] costs of $24,586,319 because the Arden Row transaction was nonsyndicated and did not have outside investors. He knew that the settlement proposal was inconsistent with the 2020 settlement initiative and the Commissioner's standard settlement proposals in easement cases. Accordingly, he knew that respondent had made a mistake in ascertaining the amount of investor out-of-pocket costs. Mr. Norman also knew that respondent had made a mistake in the amount of investor out-of-pocket costs, which he defined as "the amount that the owners of [Natural Aggregates] paid for their interests." He knew that Natural Aggregates owned eight entities and that $24,586,319 was the amount that Natural Aggregates contributed to all eight entities including Kellum Resources, which claimed a $48,696,199 easement deduction.

Mr. Johnson raised his concerns about the amount of the proposed deduction with Mr. Welty. Mr. Welty was aware that the Commissioner's standard settlement offer was a deduction for investor out-of-pocket costs. He was familiar with the 2020 settlement initiative, the *LakePoint* settlement, and the negotiations for the global settlement of the Ornstein-Schuler cases. He knew that respondent intended to propose a deduction for the approximate amount of Natural Aggregates' out-of-pocket costs and that respondent had made a mistake in determining Natural Aggregates' investor out-of-pocket costs for the Arden Row transaction. Welty PC attorneys, including Mr. Welty, discussed investor out-of-pocket costs in a nonsyndicated transaction such as the Arden Row transaction, including via email. Mr. Welty told the other attorneys that they did not need to confirm whether $24,586,319 was the amount of investor out-of-pocket costs because respondent agreed to use the amount shown as cash capital contributions on the investment-tier partnership's Schedule M–2 for the deduction.

Mr. Welty told Mr. Schuler that respondent had proposed a $24,586,319 deduction in exchange for disallowance of the easement deduction in its entirety and sought Mr. Schuler's approval to accept the offer. However, he did not tell Mr. Schuler that respondent meant to propose a deduction for investor out-of-pocket costs or that respondent used the cash capital contributions shown on Natural Aggregates' Schedule M–2 as a proxy for Natural Aggregates' out-of-pocket costs. Mr. Welty did not ask Mr. Schuler the amount of Natural Aggregates' out-of-pocket costs for the Arden Row transaction. The two men did not discuss Natural Aggregates' out-of-pocket costs or the Schedule M–2. Instead, they discussed whether petitioner should accept a settlement

[*12] for a $24,586,319 deduction. They recognized that the settlement proposal was better than respondent's settlement proposals in other Ornstein-Schuler cases and discussed this shared opinion. Mr. Schuler considered the $24,586,319 deduction relative to the disallowed $57,080,000 easement deduction and authorized Mr. Welty to accept a settlement proposal for a fixed deduction of $24,586,319. In making his decision to proceed with the settlement, Mr. Schuler did not consider Natural Aggregates' out-of-pocket costs.[4]

Although the two men did not discuss Natural Aggregates' out-of-pocket costs, both men knew that the costs were not $24,586,319. Mr. Welty did not suggest to Mr. Schuler that respondent had made a mistake in the amount of the proposed deduction. Mr. Schuler knew that Natural Aggregates' out-of-pocket costs were substantially less than $24,586,319.

Mr. Welty instructed Mr. Norman to draft a response accepting the settlement proposal. Mr. Norman confirmed that the amount shown on Natural Aggregates' Schedule M–2 matched the amount of the proposed deduction. He did not investigate or seek substantiation for the amount of Natural Aggregates' cash contribution to Arden Row.

On November 7, 2023, Mr. Welty sent a letter in response to the settlement proposal to Ms. Joe that stated:

> We are writing in response to your letter dated October 24, 2023, wherein the Office of Chief Counsel proposed to settle the above referenced case. . . . We have been instructed, on behalf of Petitioner, to accept the settlement proposal. We agree with your proposal to determine the amount of the allowed "other deduction" by reference to . . . the investment-tier partnership's Schedule M–2, Capital Contributed (Cash).

For convenience, we refer to this letter as the acceptance letter. Mr. Welty attached a copy of the settlement proposal to the letter. Mr. Welty did not consult Mr. Ornstein before he sent the acceptance letter. Mr. Ornstein delegated decision making relating to the litigation and

---

[4] Petitioner has not established that Welty PC provided a copy of the settlement proposal to Mr. Schuler before he authorized acceptance of a $24,586,319 fixed deduction. Mr. Schuler testified that he first saw the settlement proposal in the first or second quarter of 2024. Accordingly, Mr. Schuler's knowledge about the terms of the settlement proposal was based on his conversation with Mr. Welty.

[*13] settlement of Ornstein-Schuler cases to Mr. Schuler. Nor did Mr. Welty consult with Mr. Kaynard, Arden Row's designated individual. Mr. Welty did not seek or receive Mr. Kaynard's approval before sending the acceptance letter. Mr. Kaynard did not testify at the evidentiary hearing, and there is no information in the record as to why he was not consulted about the settlement proposal.

Around the same time, Welty PC sent substantially similar letters in response to six of the eight settlement proposals that it received for Ornstein-Schuler cases during October 2023.[5] After the exchange of letters in those six cases, respondent agreed to small increases in the deductions for out-of-pocket costs to include amounts not shown on the investment-tier partnership's Schedule M–2.

VIII.  *Parties' Communications After Exchange of Letters*

In December 2023 Ms. Joe prepared a draft of a decision document that allowed a $24,586,319 deduction and shared it with the Oversight Committee for review. Ms. Mattonen responded that a $24,586,319 deduction seemed high for out-of-pocket costs. On December 12, 2023, Mr. Cappel informed Mr. Johnson via email that respondent was "having difficulty ascertaining the out-of-pocket amount" for the Arden Row transaction. Within a few days the two men spoke by phone, and Mr. Cappel told Mr. Johnson that the parties needed to discuss the amount of Natural Aggregates' out-of-pocket costs. Mr. Johnson told Mr. Cappel that petitioner thought that there was a deal.

On January 23, 2024, Mr. Cappel sent a letter to Mr. Norman that proposed to change the amount of the proposed deduction to $110,900, the amount of cash capital contributions shown on Arden Row's Schedule M–2. The letter stated that "[u]pon further review, the $24,586,319 amount does not represent the approximate out-of-pocket costs." Mr. Cappel advised that if petitioner did not agree to $110,900, it would need to substantiate investor out-of-pocket costs. Welty PC did not request substantiation from Natural Aggregates for its out-of-pocket costs. As of the evidentiary hearing, petitioner had not produced any substantiation.

---

[5] The amounts of the proposed deductions were between 16.32% and 16.49% of the easement deductions in seven of the eight cases. For one case, the percentage was 22.34%. For this case, a $24,586,319 deduction is 43.07% of the easement deduction.

[*14] On January 31, 2024, the parties notified the Court in a Joint Status Report for a consolidated group of 34 Ornstein-Schuler cases that included this case that they had reached a "tentative basis for settlement." The Court granted an extension of time for the parties to file motions for entry of decision. Welty PC attorneys were counsel of record in all 34 consolidated cases. Mr. Johnson left Welty PC on February 5, 2024.

During a conference call on February 7, 2024, Ms. Joe again informed petitioner's counsel that she believed that $24,586,319 was not the correct amount of investor out-of-pocket costs. She reiterated respondent's position that if petitioner did not agree to a $110,900 deduction, it would need to substantiate investor costs. Petitioner's counsel replied that they needed to confer with the client. On March 12, 2024, Ms. Joe emailed Mr. Norman to follow up on respondent's January 23, 2024, letter, noting that the parties needed to file a decision document or a joint status report by April 1, 2024.

On March 20, 2024, Mr. Norman emailed Ms. Joe stating that "Petitioner accepted respondent's offer to settle" through the exchange of letters. He wrote:

> Notwithstanding such prior offer and acceptance, Respondent's letter, dated January 23, 2024, proposes to modify the amount of the . . . deduction from $24,586,319 to $110,900 . . . .
>
> We are only authorized to accept . . . a settlement proposal that allows Arden Row . . . [a] deduction equal to $24,586,319. Accordingly, we cannot agree to Respondent's Proposal to modify the amount of the . . . deduction from $24,586,319 to $110,900. If Respondent allows [a] . . . deduction equal to $24,586,319 (as was originally offered and accepted), we remain authorized . . . to settle . . . on such terms. In addition, we are also authorized to engage in mediation pursuant to Tax Court Rule 124 to resolve the amount of the other deduction . . . .

(Internal quotation marks omitted.)

The next day Ms. Joe sent a letter to Mr. Norman stating respondent's position that there is no binding agreement. Ms. Joe wrote:

[*15]     Given the current state of our correspondence, the parties do not have a settlement or a meeting of the minds in this case. The provision that you cited from respondent's proposed settlement letter of October 24, 2023, also noted that the other deduction was intended to approximate out-of-pocket costs. The investment tier partnership – Natural Aggregates Partners, LLC – held interests in numerous other partnerships, and the $24,586,319 amount could not reflect the out-of-pocket costs to participate in the Arden Row transaction, when the Schedule M–2 for Arden Row Assets, LLC reflected cash of only $110,900. Your firm has acknowledged the mistake in our discussions. Accordingly, respondent does not agree that mediation would be useful.

Ms. Joe further stated that she would inform the Court in a status report due April 1, 2024, that there is no settlement agreement.

On March 27, 2024, Mr. Welty filed a Motion for Extension of Time to file decision documents in 11 of the 34 consolidated cases for partnerships subject to the BBA. In the Motion Mr. Welty wrote that "the parties have not reached a basis for settlement with respect to one case—Arden Row." He excluded this case from the request for an extension of time.

On April 1, 2024, the parties filed a Joint Status Report informing the Court that "[t]he parties do not have a basis for settlement." The parties continued to engage in trial preparation and exchanged informal discovery requests. Respondent engaged valuation experts and made site visits. On May 1, 2024, the parties filed a Joint Status Report that proposed trial dates on the substantive issues in this case. The Court set the trial for September 2024. On May 21, 2024, petitioner filed a Motion to Enforce Settlement.

OPINION

A controversy before this Court may be settled by agreement of the parties. *Stamm Int'l Corp. v. Commissioner*, 90 T.C. 315, 316 (1988). A settlement is a contract, and accordingly, general principles of contract law determine whether the parties have reached a settlement. *Dorchester Indus. Inc. v. Commissioner*, 108 T.C. 320, 330 (1997) (citing *Manko v. Commissioner*, T.C. Memo. 1995-10), *aff'd*, 208 F.3d 205 (3d Cir. 2000) (unpublished table decision). Formation of a contract requires the mutual assent of the parties to its essential terms, i.e., a meeting of

**[\*16]** the minds, which is manifested through an offer and acceptance. *Id.*; *Manko*, T.C. Memo. 1995-10; *Heil v. Commissioner*, T.C. Memo. 1994-417.

The parties may enter into a binding settlement agreement through the exchange of letters. *Dorchester Indus. Inc.*, 108 T.C. at 330; *Haiduk v. Commissioner*, T.C. Memo. 1990-506; *see also Treaty Pines Invs. P'ship v. Commissioner*, 967 F.2d 206, 211 (5th Cir. 1992). Accordingly, the Commissioner may enter into a binding agreement to settle a controversy pending before this Court without filing a stipulation of settlement or decision document. *See Johnston v. Commissioner*, 122 T.C. 124, 129 (2004), *supplementing* 119 T.C. 27 (2002), *aff'd*, 461 F.3d 1162 (9th Cir. 2006); *Himmelwright v. Commissioner*, T.C. Memo. 1988-114.

Whether the parties have reached a settlement agreement is governed by general principles of contract law. *Robbins Tire & Rubber Co. v. Commissioner*, 52 T.C. 420, 435–36 (1969), *supplemented by* 53 T.C. 275 (1969); *Haiduk*, T.C. Memo. 1990-506. The interpretation of a contract, including whether the contract is ambiguous, is a question of law. *Estate of Ray v. Commissioner*, 112 F.3d 194, 196 (5th Cir. 1997) (citing *FDIC v. McFarland*, 33 F.3d 532 (5th Cir. 1994)), *aff'g* T.C. Memo. 1995-561. However, whether there was a meeting of minds is a question of fact. *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 146 (2d Cir. 2001); *Estate of Halder v. Commissioner*, T.C. Memo. 2003-84, slip op. at 6, *supplemented by* T.C. Memo. 2003-284. Petitioner has the burden to prove that there is a binding settlement agreement in this case. *See Applegarth v. Commissioner*, T.C. Memo. 2024-107, at \*20. Where the parties have entered into a settlement agreement, it is generally enforceable in the absence of fraud, coercion, mutual mistake, or other extraordinary circumstances. *See, e.g.*, *Estate of Jones v. Commissioner*, 795 F.2d 566, 573–74 (6th Cir. 1986), *aff'g* T.C. Memo. 1984-53; *Dorchester Indus. Inc.*, 108 T.C. at 335; *Saigh v. Commissioner*, 26 T.C. 171, 176 (1956); *Holland v. Commissioner*, T.C. Memo. 1992-691. A settlement agreement is binding regardless of the actual merits of the controversy. *Dorchester Indus. Inc.*, 108 T.C. at 330 (citing *Manko*, T.C. Memo. 1995-10).

We find that there is no binding settlement agreement. There are three grounds for this decision, each independently sufficient to find that no settlement agreement exists. For the sake of completeness, we address all three.

**[\*17]** I.  *Decision Document*

Respondent argues that under the terms of the settlement proposal, a decision document is required for a binding agreement. We agree. An offer is generally defined as a manifestation of willingness to enter into a contract. Restatement (Second) of Contracts § 24 (Am. L. Inst. 1981). An offer must be made in a manner "as to justify another person in understanding that his assent to that bargain is invited and will conclude [the contract]." *Id.* "A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent." *Id.* § 26; *see also Dorchester Indus. Inc.*, 108 T.C. at 330 (citing *Manko*, T.C. Memo. 1995-10). Accordingly, we have stated that the offeror has the power to prescribe the method of accepting the offer. *Lamborn v. Commissioner*, T.C. Memo. 1994-515, 1994 WL 565157, at \*5.

The Commissioner may condition a settlement agreement on the execution of an additional document such a decision document. When the Commissioner does so, the execution of that document controls whether a binding agreement was in fact reached. *See, e.g.*, *Estate of Ray v. Commissioner*, 112 F.3d 194 (finding settlement offer required the execution of an IRS form signed by both parties as a condition to a binding agreement); *Treaty Pines Invs. P'ship v. Commissioner*, 967 F.2d at 211 (binding agreement existed where IRS did not contemplate execution of further, formal documents); *Dorchester Indus. Inc.*, 108 T.C. at 332–33 (finding offer only "called for a written acceptance," i.e., a letter was sufficient); *Greenberg Bros. P'ship #12 v. Commissioner*, T.C. Memo. 1998-198.

The terms of the settlement proposal clearly and unambiguously indicate that respondent required the filing of a decision document to reach a binding agreement. Clause 5 provides that "Respondent and Petitioner agree to resolve this case by filing a decision document." Respondent required more than a simple exchange of letters for petitioner to accept the settlement proposal. Petitioner did not accept respondent's purported offer in the manner that respondent prescribed. Under the terms of the settlement proposal, there is no binding agreement until a decision document is filed.[6] Petitioner characterizes

---

[6] We easily distinguish this case from *Stamm International Corp.*, 90 T.C. 316, and *Dorchester Industries Inc.*, 108 T.C. 320, in which we enforced settlements as binding agreements. In each case there was no doubt that a settlement agreement

**[\*18]** the filing of a decision document as a "purely ministerial act." We disagree. We find that the filing of a decision document is a material term of the settlement proposal.

Petitioner's own actions confirm that it did not believe that the exchange of letters accomplished a binding agreement. Petitioner had many opportunities to notify the Court of its current position that the parties had entered into a binding agreement. It did the opposite.[7] It filed Joint Status Reports informing the Court that there was no settlement and proposing trial dates on the substantiative issues in this case. We set the case for trial. The parties continued to pursue discovery and to draft stipulations of fact. Respondent engaged experts and made site visits. Petitioner did not inform the Court of its position that there is a binding agreement until May 21, 2024, when it filed the Motion to Enforce Settlement. We canceled the trial date to consider petitioner's Motion, not because of respondent's actions.

We find it implausible that if, in fact, petitioner believed that there was a binding agreement, it would not have protested respondent's alleged reneging on the agreement earlier. Respondent had been questioning the $24,586,319 amount since December 2023. Welty PC attorneys realized that respondent had made a mistake in the amount of Natural Aggregates' out-of-pocket costs even before it sent the acceptance letter. After respondent discovered the mistake, petitioner tried to negotiate with respondent. When negotiations failed, petitioner filed the Motion at issue. We are not convinced by petitioner's arguments to explain away the Joint Status Reports. It argues that the representations to the Court that there was a basis for settlement meant that they were still negotiating the terms of the decision document. We find that petitioner agreed to file the Joint Status Report because it

---

existed because the parties filed a stipulation of settled issues or otherwise notified the Court that they had reached a settlement agreement. *See also Bailey v. Commissioner*, T.C. Memo. 2021-55, at \*12–14 (finding that the parties filed a stipulation of settled issues); *Tompkins v. Commissioner*, T.C. Memo. 1989-363 (same). On June 3, 2025, petitioner filed a Notice of Supplemental Authority citing an order in *Moretti v. Commissioner*, No. 5983-24 (T.C. June 2, 2025), in which the Court refused to set aside a settlement stipulation and a stipulated decision that the parties filed with the Court approximately five weeks before the scheduled trial date. We find that *Moretti* is similar to *Stamm International Corp.* and *Dorchester Industries Inc.* and easily distinguishable from this case.

[7] According to respondent's March 21, 2024, letter to Welty PC, Welty PC had previously acknowledged that there was a mistake in the settlement proposal.

**[\*19]** knew that there was no binding agreement and respondent refused petitioner's request to engage in mediation.[8]

The terms of the settlement proposal required the filing of an agreed decision document. Accordingly, there was no binding agreement through the exchange of letters.

II. *Mutual Assent*

Respondent argues that there was no mutual assent to the amount of the allowable deduction and, thus, no settlement agreement. Alternatively, he argues that if the Court finds that there was mutual assent, there was a mutual mistake regarding the deduction for out-of-pocket costs, and the Court should set aside the agreement.

"A prerequisite to the formation of a contract is an objective manifestation of mutual assent to its essential terms." *Dorchester Indus. Inc.*, 108 T.C. at 330 (first citing *Heil*, T.C. Memo. 1994-417; then citing 17 Am. Jur. Contracts §§ 27 and 28 (1991); and then citing 1 Williston on Contracts § 3:5 (4th ed. 1990)). According to Restatement § 20(1), there is no manifestation of mutual assent if the parties attached materially different meanings to their manifestations and neither party knew the meaning attached by the other party, or alternatively, if both parties knew the meaning attached by the other party. *See also* Restatement § 201(2) and (3). Thus, a material difference in the parties' understanding of the terms of the exchange means that there is no mutual assent. According to the Restatement, we determine each party's attached meaning on the basis of an objective standard, and the parties' subjective intentions or understandings do not govern the question of mutual assent. Restatement § 20 cmt. b.

---

[8] In practice the exchange of letters did not end negotiations over the amounts of the deductions for out-of-pocket costs. After the exchange of substantially similar letters in six other Ornstein-Schuler cases, the parties increased the amounts of the deductions from the amounts stated in the Commissioner's settlement proposals. Similarly, in *LakePoint*, the parties decreased the amount of the deduction to exclude part of the cash capital contributions shown on the investment-tier partnership's Schedule M–2 that was attributable to Mr. Ornstein's, Mr. Schuler's, and their related entities' out-of-pocket costs, consistent with the Commissioner's position in the 2020 settlement initiative, which provided that Category One partners were not entitled to deduct out-of-pocket costs. We have previously found that the continued negotiations that sought to modify a central settlement term "illustrate[] that a meeting of the minds had not occurred between the parties." *Barela v. Commissioner*, T.C. Memo. 2004-175, slip op. at 12.

**[*20]** The mutual mistake doctrine comes into play when there is a contract, i.e., there was a meeting of the minds, and a party asks to have the contract voided, or reformed, because of a mutual mistake. *Id.* § 152(1). A mutual mistake occurs when the parties make the same erroneous assumption about the facts. *Id.* §§ 151 and 152; *see also Dutton v. Commissioner*, 122 T.C. 133, 139 (2004) ("A mutual mistake exists where there has been a meeting of the minds of the parties and an agreement actually entered into but the agreement in its written form does not express the actual intention of the parties.").

We find that there was no mutual assent. It is clear that the parties attached different meanings to the allowable deduction. Petitioner asserts that the parties agreed to a deduction for a fixed amount. It is clear that a fixed deduction of $24,586,319 is the meaning that Mr. Schuler, the person who authorized acceptance of the offer, attached to the settlement proposal.[9] Mr. Welty told Mr. Schuler that respondent proposed a deduction of $24,586,319 but did not disclose that respondent based the amount on investor out-of-pocket costs. The two men discussed only the fixed amount. They did not discuss Natural Aggregates' cash capital contributions to Arden Row, the amount of its out-of-pocket costs for the Arden Row transaction, or its Schedule M–2. Accordingly, Mr. Schuler did not consider or agree to a deduction for the approximate value of Natural Aggregates' out-of-pocket costs. He agreed to a fixed deduction of $24,586,319 and that was his meaning.

It is equally as clear that respondent attached a different meaning to clause 2 of the settlement proposal. Respondent objectively manifested his intent to enter into a settlement that allowed a deduction of investor out-of-pocket costs although he agreed to accept the amount shown on Schedule M–2 as an administrative convenience instead of requiring investors to substantiate their costs. Welty PC knew respondent's manifested intent from the 2020 settlement initiative, nearly four years of discussions with petitioner for a global settlement, and the *LakePoint* settlement. The meaning given to words of a contract depends to a varying extent on the context and the prior experience of the parties. Restatement § 20(1) & cmt. b. Mr. Johnson admitted that he knew that a deduction for investor out-of-pocket costs was the Commissioner's standard settlement proposal.

---

[9] As we discuss *infra* Part III, Mr. Schuler was not the proper person to authorize the settlement. Nevertheless, he was the only person who authorized the settlement, and we find that his meaning is determinative.

**[*21]** Respondent argues that Natural Aggregates had out-of-pocket costs of $110,900, the amount of cash capital contributions shown on Arden Row's Schedule M–2. Petitioner has not established that investor out-of-pocket costs were more than $110,900. Mr. Schuler testified that he did not know Natural Aggregates' out-of-pocket costs for the Arden Row transaction but admitted they were substantially less than $24,586,319. That amount likely grossly overstated costs.

Having found that the parties attached different meanings to the proposed deduction, the next question is whether each party knew the other's attached meaning. We find that neither party knew the meaning attached by the other party.[10] Mr. Welty told Mr. Schuler that respondent had proposed a deduction of $24,586,319 in exchange for a full concession of the $57,080,000 easement deduction. He did not tell Mr. Schuler that respondent based this figure on Natural Aggregates' out-of-pocket costs for the Arden Row transaction or its Schedule M–2. In deciding whether to accept the settlement proposal, Mr. Schuler considered the $24,586,319 deduction relative to the $57,080,000 easement deduction. He did not consider out-of-pocket costs.

It is clear that Welty PC attorneys knew that respondent intended to propose a standard settlement proposal of investor out-of-pocket costs. Welty PC attorneys knew that the Arden Row transaction was nonsyndicated and did not have outside investors and that they knew Natural Aggregates owned eight entities. Two Welty PC attorneys, Messrs. Norman and Johnson, admitted that they knew these facts. Accordingly, they knew or should have known that Natural Aggregates did not have approximately $24,586,319 in out-of-pocket costs and that respondent had made a mistake by referring to the amount shown for cash capital contributions on Natural Aggregates' Schedule M–2 as a proxy for investor out-of-pocket costs.

On the basis of the other evidence in the record and our assessment of witness testimony, including the testimony of Welty PC attorneys who communicated with Mr. Welty, we find that Mr. Welty also knew that respondent had made a mistake.[11] Moreover, he should have known that respondent had made a mistake from the simple fact that he represented another one of Natural Aggregates' entities, Kellum

---

[10] If one party knows the meaning attached by the other party and manifests its assent intending to insist on a different meaning, it may be guilty of misrepresentation. Restatement § 20 cmt. d.

[11] Ms. Joe testified that she learned that Natural Aggregates owned multiple entities from Form 886–A. Mr. Welty had access to Form 886–A.

**[\*22]** Resources, before this Court with respect to a $48.7 million easement deduction for 2018.

However, Mr. Welty did not tell Mr. Schuler that respondent had made a mistake. In fact, no one communicated respondent's mistake to Mr. Schuler. As stated above, Mr. Welty told Mr. Schuler the $24,586,319 figure but did not tell him that respondent intended to propose a deduction for the approximate amount of Natural Aggregates' out-of-pocket costs for the Arden Row transaction. Finally, petitioner has not established that Welty PC provided a copy of the settlement proposal to Mr. Schuler before he accepted a $24,586,319 fixed deduction. Mr. Schuler testified that he first saw the settlement proposal in the first or second quarter of 2024. Thus, Mr. Schuler's knowledge of the terms of the settlement proposal was based entirely on his conversation with Mr. Welty. There was no way for Mr. Schuler to know that respondent had made a mistake.

Likewise, respondent was not aware that Mr. Schuler had only approved a settlement for a fixed deduction of $24,586,319. There is no reason for respondent to have known what Mr. Welty communicated to his client. Accordingly, there was no mutual assent.

Petitioner argues that the actual amount of investor out-of-pocket costs is irrelevant under the settlement proposal. We disagree. Clause 2 states a specific amount of the proposed deduction and also states that the specified amount approximates investor out-of-pocket costs. Petitioner's argument would require us to ignore part of clause 2, which we will not do. Contracts must be read as a whole and must be interpreted in context. *Analog Devices, Inc. v. Commissioner*, 147 T.C. 429, 446 (2016). An interpretation that gives a reasonable meaning to all parts of a writing is preferred to one that leaves parts of it meaningless. *Rink v. Commissioner*, 100 T.C. 319 (1993), *aff'd*, 47 F.3d 168 (6th Cir. 1995). Accordingly, the actual amount of investor out-of-pocket costs is material under clause 2 of the settlement proposal.

Since 2020 the Commissioner has settled easement cases by allowing a deduction for investor out-of-pocket costs. While the Commissioner was willing to agree not to require substantiation for investor out-of-pocket costs as an administrative convenience, he continued to maintain the settlement position to allow investors to deduct their out-of-pocket costs for a concession of the easement deduction in its entirety and a reduction or concession of penalties. Throughout the course of this proceeding, Welty PC deliberately avoided

**[\*23]** asking its client for substantiation of its out-of-pocket costs despite respondent's multiple requests for that information. Welty PC knew that respondent made a mistake but did not communicate that mistake to its client or respondent.

Petitioner contends that respondent meant to offer a $24,586,319 deduction, even though Natural Aggregates did not have approximately $24,586,319 in out-of-pocket costs, because the IRS's backdating of penalty approval forms in easement cases had been exposed.[12] We are not convinced by this argument. The investors in *LakePoint* did not receive such a favorable settlement even though that case involved a backdated penalty approval form and the Court had held that the Commissioner was subject to sanctions. Moreover, even without the mistake in the amount of the proposed deduction, the settlement proposal was more favorable to petitioner and Natural Aggregates than the 2020 settlement initiative, the IRS standard settlement proposals, and the *LakePoint* settlement, which disallowed any deductions by Category One partners such as Messrs. Ornstein and Schuler. Had respondent followed the same approach in this case, respondent would have offered a minimal deduction because Messrs. Ornstein and Schuler and their related entities owned 98% of Arden Row. Rather than make an offer for a highly advantageous deduction, respondent conceded penalties of over $8.4 million because of the backdating. Furthermore, we perceive no hazards of litigation to respondent concerning the disallowance of the easement deduction because of the backdating issue.

III.   *BBA Partnership Rules*

We next consider who had authority to enter into a settlement to resolve partnership-related items under the BBA.[13] We have two concerns: (1) whether the person with authority to enter into a settlement for Arden Row approved the settlement and (2) whether an individual partner of Arden Row may separately enter into a settlement to resolve its tax liability attributable to partnership-related items.

---

[12] Petitioner also argues that respondent was more concerned with a quick settlement and wanted a response within three to four days and that he was not concerned about the actual amount of investor out-of-pocket costs. This allegation is not supported by evidence in the record. The settlement proposal does not specify a deadline to respond. Ms. Joe willingly agreed to a 30-day extension when requested by Welty PC attorney Lyle Press. Mr. Press testified that he requested 30 days as a professional courtesy and to confirm receipt of the settlement proposal.

[13] Neither party addressed whether Ms. Joe had authority to bind respondent.

**[\*24]**  With respect to the first question, under the BBA the partnership representative "shall have the sole authority to act on behalf of the partnership." § 6223(a). The partnership and all its partners are bound by the actions taken by the partnership and by a final decision in a proceeding brought under the BBA with respect to the partnership. § 6223(b). Only the partnership representative has the power to bind the partnership and its partners in an audit or judiciary proceedings. Accordingly, only a settlement accepted by the partnership representative is binding upon the partnership and the partners. When the partnership representative is an entity, the designated individual assumes the role of partnership representative and represents the partnership and partners in the audit and litigation. Treas. Reg. § 301.6223-1(b)(3).

Mr. Schuler did not have the authority to act for Arden Row under the BBA and did not have authority to enter a settlement on behalf of Arden Row. There is no evidence in the record that Mr. Kaynard, the designated individual, approved the settlement or was even consulted about it. He did not testify. On the basis of the record, we find that Mr. Kaynard had no role in reviewing and accepting respondent's settlement proposal. Accordingly, the individual with sole authority to bind Arden Row under the BBA has not approved the purported settlement agreement.

With respect to the second question, Natural Aggregates did not have the right to settle its tax liability for its partnership-related items from Arden Row under the BBA. There are no statutory provisions under the BBA that expressly govern settlement agreements. The BBA differs from the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71, which allowed an individual partner to enter into a settlement agreement with the IRS that converted its partnership items into nonpartnership items. § 6224(c)(1) (2012); *H Graphics/Access Ltd. P'ship v. Commissioner*, T.C. Memo. 1992-345. There is no similar provision in the BBA. The BBA does not expressly permit individual partners to settle their tax liability attributable to partnership-related items. *See* § 6241(2)(A) (defining a partnership adjustment); § 6241(2)(B) (defining a partnership-related item). Thus, it seems that Mr. Schuler, the only person who approved the settlement proposal, could not enter into an agreement to settle his own or Natural Aggregates' tax liability for partnership-related items that was separate from a settlement applicable to all Arden Row partners. Only Mr. Maynard had authority to resolve the partnership adjustments for all partners.

**[\*25]**  In conclusion, the exchange of letters did not result in a binding settlement agreement as the settlement proposal required the filing of a decision document and there was no mutual assent. Each of these reasons is sufficient to deny petitioner's Motion to Enforce Settlement. Moreover, there is no provision in the BBA that permits an individual partner to settle the tax liability for partnership-related items, and the designated individual for the partnership representative did not authorize acceptance of the settlement proposal before respondent realized that it was a mistake to use amounts on the investment-tier partnership's Schedule M–2 as the approximate investor out-of-pocket costs in a nonsyndicated transaction.

We have considered all other arguments by the parties, and, to the extent not addressed herein, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

*An appropriate order will be issued.*